Robert Anthony **BROWN**, Appellant,

v.

The **STATE** of Texas, Appellee.

Nos. 01–05–00074–CR, 01–05–00075–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Dec. 14, 2006.

Patrick F. McCann, Law Offices of Patrick F. McCann, Houston, for Appellant.

Eric Kugler, Asst. Dist. Atty. of Harris County, Charles A. Rosenthal, Jr., Dist. Atty.–Harris County, Houston, for State.

Panel consists of Justices TAFT, HIGLEY, and BLAND.

## OPINION ON REHEARING

JANE BLAND, Justice.

The State charged appellant Robert Anthony Brown with aggravated robbery with a deadly weapon and impersonation of a public servant. A jury found Brown guilty of both offenses, and after finding two enhancement paragraphs true, sentenced him to forty-five years' imprisonment for each offense. In five issues, Brown contends the evidence is legally and factually insufficient to sustain the jury's verdict on aggravated robbery with a deadly weapon, the trial court erred in denying his motion to suppress evidence obtained during a search of his motel room, and the trial court erred in admitting evidence of extraneous offenses during the punishment phase. In our opinion dated August 3, 2006, we affirmed the felony conviction for impersonation of a public servant, but held that the evidence was factually insufficient to support the jury's verdict on the aggravated robbery conviction regarding the use of a deadly weapon. We therefore reversed and remanded for a new trial as to that charge only. The State moved for rehearing and rehearing en banc, contending that Brown did not raise a specific factual sufficiency challenge as to the deadly weapon element of aggravated robbery, and that, in any event, the evidence is factually sufficient to support the jury's finding of the deadly weapon element of aggravated robbery. We withdraw our previous opinion and issue this opinion in its stead.[1] We affirm the trial court's judgments in full.

### Facts

One evening in June 2003, Jose Galvez cashed his paycheck at a convenience store near his home, and chatted with some

---

1. As we have issued an opinion on rehearing, we deny the State's motion for en banc reconsideration as moot. *See Brookshire Bros. v.* *Smith,* 176 S.W.3d 30, 40 n. 2 (Tex.App.-Houston [1st Dist.] 2004, pet. denied).

friends who work at a local strip club. On his way home, Galvez observed a white pickup truck following him that he had noticed at the convenience store. The truck displayed what he believed to be police lights. He drove the short distance to his home, where he pulled into his driveway. The truck pulled up behind him, blocking him in. Rene Sanchez exited the truck, approached Galvez, showed him a police badge, and told Galvez in broken Spanish that he had pulled him over for looking for prostitutes and drugs.

Sanchez ordered Galvez to spread his legs and place his hands on the seat of his vehicle while he checked Galvez's driver's license in his computer. Galvez testified that when he had been pulled over previously, the officers had given him similar instructions. While Sanchez supposedly checked Galvez's identification ("ID"), Brown stood by the passenger's side door of the truck shining what Galvez believed to be a police flashlight at Galvez's tags and house. Galvez testified that Brown held a flashlight in one hand and something else in the other hand, and made signs as though he had a weapon. Galvez testified that another man, the driver, waited inside the truck, but Galvez's wife, Amanda, testified that she saw only two men, Brown and Sanchez. After waiting a moment for Sanchez to check his ID, Galvez approached Sanchez's truck and noticed that it contained some dirty clothes but no computer, at which point Sanchez grabbed Galvez, threw him against the side of the truck, and put a gun to his head. Galvez testified that he did not know if Sanchez's gun was real, but it felt cold against his skin and he was afraid.

Amanda was in the house when the incident began, but went onto her porch when she saw the lights outside. Amanda testified that she came out of the house three separate times during the robbery. The first time she just noticed that the men

were not friends of her husband so she immediately went back inside. The second time, her children ran out of the house to see their father so Amanda went after them. While she was outside, she saw Brown holding a bright light in his left hand and a walkie-talkie in his right hand. Amanda then went outside a third time with her children close behind her. She walked toward Brown and saw that he was holding a bright light in his left hand and a gun in his right hand. Brown pointed the gun at Amanda and her children and said, "bitch, get in the house or there's going to be problems for you and your family." Brown tried to blind Amanda with the light but she testified that she could still see him. Amanda saw Sanchez quietly say something to Galvez, and Galvez then asked her to please go in the house. Amanda returned to her house again, and when she looked through her window, she saw Brown talking on a walkie-talkie, which he held in his right hand, while still shining the light at her house with his left hand. During the incident, Sanchez took Galvez's wallet, keys, and cellular phone, after which the men re-entered their truck and drove away.

Nine days later, Officer Mike Burdick pulled Brown over in a white 1988 Chevy pickup truck after observing Brown turn right without signaling. After neither Brown nor his passenger, Robert Jackowski, could provide him with ID, Officer Burdick placed the men under arrest. As Brown exited the vehicle, Officer Burdick noticed several flashlights in the front seat, a Q–Beam spotlight on the floorboard, and what appeared to be a gun under the driver's seat. At that point, Officer Burdick remembered hearing a general broadcast that several robberies had occurred in the area involving men in a white truck impersonating police officers. Once the men were safely under arrest, officers searched the truck and recovered

two flashlights, a plastic gun, a small black bat or nightstick, a Q–Beam spotlight, a hand-held radio, and a paper bag with several phrases, such as "I am the Immigration police" and "put your hands up," written on it in Spanish. Police also recovered pawn slips for assorted jewelry and a lawn mower, a wallet not belonging to either passenger, and several rings of keys.

When asked where he lived, Jackowski responded that he was staying at a nearby motel, so Officer Burdick and another officer, Lieutenant Casko, went to the motel to investigate. Upon arriving, Lieutenant Casko went to rooms twenty-nine and thirty, which he believed were occupied by Brown and Jackowski, while Officer Burdick confirmed with the motel manager that those rooms were occupied by individuals driving a white truck.

Beatrice Sanchez, Brown's wife and Sanchez's sister, answered the door when Lieutenant Casko knocked, and told Lieutenant Casko that she was staying in the room. He asked if anyone else occupied the room, she replied that no one did, and then verbally agreed to let Casko come in and look around. Casko entered the room alone to check for other occupants. He did not have his gun drawn when talking to Beatrice, but did have it in hand while looking around the corner into the bathroom for other occupants. While checking for other occupants, Casko noticed narcotics paraphernalia in plain view near the bed. He returned to Beatrice outside the room, where he was rejoined by Burdick, to request written consent to search the room.

Officer Burdick prepared, read, and explained a voluntary consent-to-search form for Beatrice and asked whether she had questions and understood the form. After she signed the consent form, officers searched the room and found a large black bag filled with dirty laundry. A black

fanny pack was discovered in the bag along with the laundry. The fanny pack contained driver's licenses, resident alien cards, credit cards, social security cards, and two checkbooks.

### Legal and Factual Sufficiency

In its motion for rehearing, the State contends (1) that Brown's appellate brief did not raise a specific challenge to the factual sufficiency of the evidence with regard to the deadly weapon element of aggravated robbery, and (2) the evidence is factually sufficient to support the jury's finding of the deadly weapon element of aggravated robbery. We agree with the State's second issue in light of the Texas Court of Criminal Appeals' recent opinion in *Watson v. State*, overruling the factual sufficiency standard of review from *Zuniga v. State*. *Watson v. State*, 204 S.W.3d 404, 415–17 (Tex.Crim.App.2006) (overruling *Zuniga v. State*, 144 S.W.3d 477, 484–85 (Tex.Crim.App.2004)). Because the State's second issue is dispositive, we do not address the waiver argument in the State's first issue.

In his first, second, and third issues, Brown contends (1) the evidence is legally and factually insufficient to sustain the jury's finding that Brown committed a robbery with a deadly weapon, (2) the evidence is legally and factually insufficient to support Brown's conviction for impersonating a police officer, and (3) the evidence is legally and factually insufficient to support either of Brown's convictions under the law of parties.

### A. Standard of Review

■ When evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a rea-

sonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Drichas v. State,* 175 S.W.3d 795, 798 (Tex.Crim.App.2005). The standard is the same for both direct and circumstantial evidence cases. *King v. State,* 895 S.W.2d 701, 703 (Tex.Crim. App.1995). We do not resolve any conflict of fact, weigh any evidence, or evaluate the credibility of any witnesses, as this was the function of the trier of fact. *See Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim. App.1992); *Matson v. State,* 819 S.W.2d 839, 843 (Tex.Crim.App.1991). Instead, our duty is to determine whether both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the verdict. *See Adelman,* 828 S.W.2d at 422. In so doing, any inconsistencies in the evidence are resolved in favor of the verdict. *Matson,* 819 S.W.2d at 843.

■ When conducting a factual sufficiency review, we view all of the evidence in a neutral light. *Ladd v. State,* 3 S.W.3d 547, 557 (Tex.Crim.App.1999). We will set the verdict aside only if (1) the evidence is so weak that the verdict is clearly wrong and manifestly unjust or (2) the verdict is against the great weight and preponderance of the evidence. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App.2000). Under the first prong of *Johnson,* we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted to acquit had we been on the jury. *Watson,* 204 S.W.3d at 417. Under the second prong of *Johnson,* we cannot declare that a conflict in the evidence justifies a new trial simply because we disagree with the jury's resolution of that conflict. *Id.* Before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson,* we must be able to say, with some objective basis in the record, that the great

weight and preponderance of the evidence contradicts the jury's verdict. *Id.* In conducting a factual sufficiency review, we must also discuss the evidence that, according to the appellant, most undermines the jury's verdict. *See Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App.2003).

■ We may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim.App.2000). The fact-finder alone determines what weight to place on contradictory testimonial evidence because that determination depends on the fact-finder's evaluation of credibility and demeanor. *Cain v. State,* 958 S.W.2d 404, 408–09 (Tex.Crim.App. 1997). As the determiner of the credibility of the witnesses, the fact-finder may choose to believe all, some, or none of the testimony presented. *Id.* at 407 n. 5.

## B. Aggravated Robbery

Brown contends the evidence is legally and factually insufficient to prove beyond a reasonable doubt that either he or Sanchez used a firearm in the commission of the robbery, and is thus insufficient to support his conviction for aggravated robbery.

■ A person is guilty of aggravated robbery if he uses or exhibits a deadly weapon in the course of committing a robbery. TEX. PEN.CODE ANN. § 29.03(a)(2) (Vernon 2003). Proof of the use or exhibition of a deadly weapon is an essential element of the offense of aggravated robbery. *Gomez v. State,* 685 S.W.2d 333, 336 (Tex.Crim.App.1985). A deadly weapon is a firearm or anything manifestly designed, made, or adapted for the purposes of inflicting serious bodily injury or anything that, in the manner of its use or intended use, is capable of causing death or serious bodily injury. TEX. PEN.CODE ANN. § 1.07(a)(17)(A), (B) (Vernon Supp.2006).

■ Here, Brown's indictment alleges not merely that he exhibited a deadly weapon, but that he exhibited a firearm. When the State alleges unnecessary matters that are descriptive of the essential elements of the crime, the State must prove the descriptive matters as alleged. *Gomez,* 685 S.W.2d at 336. Thus, when the State alleges in an indictment for aggravated robbery that the deadly weapon used by the defendant was a firearm, as it did in this case, it is required to prove use of a firearm beyond a reasonable doubt. *Edwards v. State,* 10 S.W.3d 699, 701 (Tex. App.-Houston [14th Dist.] 1999), *pet. dism'd, improvidently granted* 67 S.W.3d 228 (Tex.Crim.App.2002). A "firearm" means any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use. TEX. PEN.CODE ANN. § 46.01(3) (Vernon 2003).

■ Brown's indictment also charges him as a party to the offense of aggravated robbery. In order to convict Brown as a party to aggravated robbery, the State had to prove that he was criminally responsible for Sanchez's use or exhibition of a firearm during the offense. *See Stephens v. State,* 717 S.W.2d 338, 340 (Tex.Crim.App.1986) (holding that, in order to convict defendant as party to aggravated offense, State must prove that defendant was criminally responsible for aggravating element); *Wooden v. State,* 101 S.W.3d 542, 547–48 (Tex.App.Fort Worth 2003, pet. ref'd) (same). A person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PEN.CODE ANN. § 7.02(a)(2) (Vernon 2003); *Wooden,* 101 S.W.3d at 546. In determining whether an accused bears criminal responsibility

for an offense, we may look to events before, during, and after the commission of the offense. *Marable v. State,* 85 S.W.3d 287, 293 (Tex.Crim.App.2002).

*Legal Sufficiency*

■ Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found beyond a reasonable doubt that Brown is guilty of aggravated robbery. Galvez testified that after Brown and Sanchez pulled him over in front of his house, he exited his truck, and Sanchez told him to wait there while he verified Galvez's information in his computer. After waiting a few minutes, Galvez approached Sanchez's truck, and Sanchez pushed Galvez against the truck and put a gun near his head. Galvez testified that Sanchez's gun was the kind that "you can pull in the back of it," and that it was "cold." Galvez testified that while this occurred, Brown remained on the passenger's side of Sanchez's truck, shining a light at Galvez's house and license plate and pointing something toward Galvez's house. Brown told Amanda and the children in English to go inside or something bad was going to happen, and made signs as if he had a weapon. Galvez testified that it looked as though Brown had a gun, but that he could not tell what was in Brown's hand. Both Amanda and Galvez testified that they were afraid. Amanda testified that she came out of the house three separate times during the robbery. The third time she went outside, Amanda noticed that Brown had a gun and that he was pointing it at her and the children. Brown tried to blind Amanda with his flashlight but she could still see him. Amanda also testified that Sanchez held a gun to Galvez's head. We conclude that, viewing this evidence in a light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Brown used a firearm during the commis-

sion of the robbery. *See Wright v. State,* 591 S.W.2d 458, 459 (Tex.Crim.App.1979) (holding that evidence defendant pointed "gun," "pistol," or "revolver" at complainant was sufficient to prove use of "deadly weapon"). We also conclude that a rational jury could have found beyond a reasonable doubt that Sanchez used a firearm during the commission of the robbery, and that Brown, acting with intent to assist the commission of the robbery, attempted to aid Sanchez in using a firearm to threaten Galvez. *See Marable,* 85 S.W.3d at 293.

*Factual Sufficiency*

■ Viewing all the evidence in a neutral light, we conclude the evidence is factually sufficient to sustain Brown's conviction for aggravated robbery as the primary actor and under the law of parties. Galvez testified that during the course of the robbery he mainly paid attention to Sanchez. He testified that it was nighttime and he saw Brown from far away. Galvez was not able to describe Brown's gun. Galvez testified that he was not sure Brown had a gun, but that he was pointing something toward his house that looked like a weapon. Galvez further testified that after Brown and Sanchez pulled him over in front of his house, Sanchez told him to wait by his vehicle while he went to check the computer in his truck. After waiting a few minutes, Galvez approached the truck, and Sanchez pushed Galvez against the truck and put a gun to his head. Galvez described the gun as one of "those ones you can pull in the back of it." He testified that he did not know whether it was real or fake, but that it was "ugly" and "cold." Galvez testified that while this occurred, Brown remained on the passenger's side of Sanchez's truck, shining a light at Galvez's house and license plate and pointing something toward Galvez's house that looked like a weapon. Amanda testified that she saw Sanchez holding a gun to Galvez's head the third time she went outside. After Amanda returned to her house, she looked out the window and once again saw Sanchez holding a gun to Galvez's head.

Amanda testified that she came out of the house three separate times during the robbery. The first time she noticed that the men were not friends of her husband so she immediately went back inside. The second time, her children ran out of the house to see Galvez and Amanda went after them. While she was outside, she saw Brown holding a bright light in his left hand and a walkie-talkie in his right hand. Amanda then went outside a third time with her children close behind her. As she walked toward Brown, she saw that he was holding a bright light in his left hand and a gun in his right hand. Brown pointed the gun at Amanda and her children and said, "bitch, get in the house or there's going to be problems for you and your family." Brown tried to blind Amanda with the light but she testified that she could still see him. As soon as Amanda re-entered the house, she looked out the window and saw Brown using the walkie-talkie. Officer Burdick testified that when he pulled Brown over nine days after the incident, he found two flashlights, a Q–Beam spotlight, a hand-held radio, a nightstick, and a plastic handgun. Police never recovered an actual firearm.

In *Wright v. State,* the Court of Criminal Appeals affirmed an aggravated robbery conviction where the victim referred to the defendant's weapon as a "gun," "pistol," or "revolver." 591 S.W.2d at 459. The appellant asserted that evidence is sufficient only if the witness uses the term "firearm" or otherwise proves the use of a "deadly weapon" under one of the alternative definitions. *Id.* The court stated, "testimony using any of the terms 'gun', 'pistol' or 'revolver' is sufficient to authorize the jury to find that a deadly weapon was used." *Id.* The court held that the

State is not required to offer testimony that the defendant used a "firearm," or otherwise prove the use of a "deadly weapon" under one of the alternative definitions, to sustain an aggravated robbery conviction. *Id.*

The evidence surrounding Brown's gun in this case is conflicting. Amanda unequivocally testified that she saw Brown holding a gun and that he pointed it at her and the children. Brown tried to blind her with a flashlight but she could still see him. Galvez testified that he was not sure Brown had a gun, but Brown was pointing something toward his house that looked like it could have been a weapon. The police, however, found a plastic gun when they searched the white Chevy truck nine days after the robbery and never recovered a real gun.

The evidence surrounding Sanchez's gun is also conflicting. Galvez testified that Sanchez held a gun to his head, it felt cold, and it was the kind that you pull in the back. Galvez, however, also testified that he could not tell if the gun was real or fake. Amanda testified that she too saw Sanchez holding a gun to Galvez's head on two separate occasions.

Under *Watson v. State*, a conflict in the evidence does not justify a new trial simply because an appellate court might disagree with the jury's resolution of the conflict. 204 S.W.3d at 417. On this record, the great weight and preponderance of the evidence does not contradict the jury's firearm finding. *Id.* We therefore hold that the evidence is factually sufficient to support Brown's conviction for aggravated robbery with a firearm as the primary actor and under the law of parties.

Under the former factual sufficiency standard of review from *Zuniga*, which we relied upon in our original opinion, the Court of Criminal Appeals stated:

> [T]here are two ways in which the evidence may be insufficient. First, when

considered by itself, evidence supporting the verdict may be too weak to support the finding of guilt beyond a reasonable doubt. Second, there may be both evidence supporting the verdict and evidence contrary to the verdict. Weighing all the evidence under this balancing scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand.

144 S.W.3d at 484–85. In *Watson*, the Court of Criminal Appeals recognized that this language is problematic because it allows an appellate court to reverse a case on factual sufficiency grounds when the evidence does not satisfy the court's *own* threshold of proof for the beyond-a-reasonable-doubt standard. 204 S.W.3d at 416. Under this interpretation, the appellate court might therefore reverse a case because it simply disagrees with the jury's verdict, but until *Zuniga*, the court observed, the fact "[t]hat an appellate court would have acquitted a defendant on the same facts that convinced a rational jury to convict has not ever, by itself, met our criteria of a 'manifest injustice.'" *Id.*

The *Zuniga* court further elaborated on its factual sufficiency formulation when it stated:

> This standard acknowledges that evidence of guilt can "preponderate" in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt. Stated another way, evidence supporting guilt can "outweigh" the contrary proof and still be factually insufficient under a beyond-a-reasonable-doubt standard.

144 S.W.3d at 485. The *Watson* court noted that this language was particularly troublesome. 204 S.W.3d at 416. The first sentence suggests that evidence that is legally sufficient to convict might still be

factually insufficient if it merely "preponderates" in favor of guilt, rather than establishing guilt beyond a reasonable doubt. *Id.* Thus, even if the appellate court concludes that a rational jury could find guilt to the requisite level of confidence beyond-a-reasonable-doubt, that same appellate court should order a new trial if, viewing that same evidence neutrally, it is subjectively convinced by no more than a preponderance of the evidence. *Id.* The second sentence suggests that even if the State's evidence of guilt is weightier and more credible than the defendant's contrary evidence, and therefore "preponderates" in favor of guilt, an appellate court could find that it does not meet its own threshold level of confidence beyond a reasonable doubt, and reverse and remand on that basis. *Id.*

We based our prior holding in this case on the language from the *Zuniga* opinion that the Court of Criminal Appeals has now expressly disavowed in *Watson.* Specifically, we relied on the second prong of *Zuniga* and held that evidence contrary to the jury's verdict was strong enough that the beyond-a-reasonable-doubt standard could not have been met. As the court clarified in *Watson,* however, before finding that evidence is factually insufficient to support a verdict under the second prong of *Johnson,* we must be able to say, with some objective basis in the record, that the great weight and preponderance of the evidence *contradicts* the jury's verdict. *Id.* In this case, the evidence is factually sufficient to support Brown's aggravated robbery conviction as the primary actor and under the law of parties because we cannot say that the great weight and preponderance of the evidence contradicts the jury's verdict. Though the evidence is conflicting, and the police recovered a toy gun nine days after the robbery, the later recovery of the toy gun does not contradict Amanda's testimony that Brown threat-ened her and her children with a gun on the night in question.

In *Pena Cortez v. State,* the Corpus Christi Court of Appeals held that testimony regarding the use of a "pistol" was insufficient to sustain an aggravated robbery conviction where it was uncontroverted that the "pistol" was a toy gun. 732 S.W.2d 713, 715 (Tex.App.-Corpus Christi 1987, no pet.). This case is distinguishable from *Pena Cortez* in that there is no uncontroverted evidence that the toy gun found in Brown's truck nine days after the robbery was the same gun used during the robbery. This case is also similar to cases in which courts found the evidence sufficient to support the finding of a firearm. *See, e.g., Edwards,* 10 S.W.3d at 701–02 (evidence sufficient to support conviction for aggravated robbery where there was evidence that defendant threatened victims with gun, and two victims, one of whom stated that she was security guard once and was familiar with guns, testified that gun used in robbery resembled Colt .45 handgun and not BB gun); *Carter v. State,* 946 S.W.2d 507, 509 (Tex.App.Houston [14th Dist.] 1997, pet. ref'd) (victims' testimony that defendant used gun similar to .25 caliber gun shown at trial, and threatened to shoot victims if they did not do as he ordered, was sufficient to authorize rational jury to find that firearm was used during offense); *Benavides v. State,* 763 S.W.2d 587, 588–89 (Tex.App.Corpus Christi 1988, pet. ref'd) (evidence was sufficient to show that firearm was used during robbery and was thus sufficient to support conviction for aggravated robbery where victim, who viewed defendant from close proximity, testified that defendant used "gun" that was "automatic" and "medium-sized").

## C. Impersonating a Public Servant

■ Brown also challenges the legal and factual sufficiency of the evidence to

support his conviction for impersonating a public servant. Section 37.11(a)(1) of the Penal Code provides that "[a] person commits an offense if he impersonates a public servant with intent to induce another to submit to his pretended official authority or to rely on his pretended official acts." Tex. Pen.Code Ann. § 37.11(a)(1) (Vernon 2003).

Here, Galvez testified that while cashing his paycheck at a convenience store, he had a conversation with some of his friends who work at a strip club. On his way home, he noticed that he was being followed by a white truck he had seen at the convenience store displaying what appeared to be police lights. When Galvez stopped in his driveway, Sanchez approached his vehicle, showed him a police badge, and told him in broken Spanish that he had been stopped for soliciting prostitution and drugs. Sanchez asked for Galvez's ID and told him he was going to check the information in his computer. Galvez testified that Sanchez also told him to spread his legs and place his hands on the seat of the car, and that when real police officers had stopped him in the past, they had asked him to do the same thing. While this was taking place, Brown stood by the passenger's side of the truck, flashing a light at the tags on Galvez's vehicle. When Galvez approached the truck, Sanchez pushed him against it, and Brown asked if Galvez "was clean," meaning did he have a weapon. Amanda testified that Brown was shining a light at her and at some point appeared to be talking on a walkie-talkie. Amanda identified Brown as having participated in the incident. Two flashlights, a Q–Beam spotlight, a nightstick, a walkie-talkie, and a plastic gun were found in Brown's truck when he was pulled over. A search of Brown's vehicle also revealed several rings of keys, cellular phones, and a brown paper sack with police phrases written on it in Spanish. Galvez identified his assailant's vehicle as a white 1988–96 Chevy truck. The police later pulled Brown over while he was driving a 1988 white Chevy truck. Viewing this evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Brown impersonated a police officer. In addition, viewing the evidence in a neutral light, we conclude that the jury was rationally justified in finding Brown guilty of impersonating a police officer beyond a reasonable doubt.

### D. Identity

■ Brown contends the identification evidence in the record is factually insufficient to support either of his convictions. Before trial, Galvez identified Brown in a photograph line-up by writing his signature underneath Brown's picture. Galvez admitted that he identified Brown's picture after Amanda, and that her signature was already under Brown's picture when he made his identification. During cross-examination, Galvez also admitted that it was dark on the night of the robbery and he could not see very well. Galvez could not see what Brown was wearing during the robbery because Brown was standing behind one of the truck doors. Officer Brillon testified that he did not remember Galvez identifying Brown in the photograph line-up, but acknowledged that Galvez's signature under Brown's picture indicates that he did make the identification. Brillon's report does not indicate that Galvez identified Brown. Officer Hernandez, who was also present during the line-up, did not recall that Galvez identified Brown.

Amanda went outside three separate times during the course of the robbery and looked out a window once. Brown tried to blind her with his flashlight several times but she testified that she could still see his face. She also testified that her porch light was on during the robbery. Amanda

testified that she stood twelve paces from where the incident occurred, and that she was too far away and it was too dark to describe Brown's facial features, determine if he had scars or tattoos, determine the color of his eyes, or determine whether he had facial hair. Amanda identified Brown in the photograph line-up, as well as in court.

Galvez and Amanda both testified that the automobile used in the robbery was a white Chevy pickup truck. The police arrested Brown and Jackowski nine days after the robbery driving a white Chevy truck. After searching the truck, the police found two flashlights, a plastic gun, a small black nightstick, a Q–Beam spotlight, a hand-held radio, and a paper bag with several police phrases written on it in Spanish. Police also recovered pawn slips for assorted jewelry and a lawn mower, a wallet not belonging to either passenger, and several rings of keys.

When asked where he lived, Jackowski responded that he was staying at a nearby motel, so Officer Burdick and Lieutenant Casko went to the motel to investigate. Upon arriving, Lieutenant Casko went to rooms twenty-nine and thirty, which he believed were occupied by Brown and Jackowski, while Officer Burdick confirmed with the motel manager that those rooms were occupied by individuals driving a white truck.

Beatrice (Brown's wife and Sanchez's sister) answered the door when Lieutenant Casko knocked, and told Lieutenant Casko that she was staying in the room. He asked if anyone else occupied the room, she replied that no one did, and then verbally agreed to let Casko come in and look around. While checking for other occupants, Casko noticed narcotics paraphernalia in plain view near the bed. Beatrice consented to a search of the room and the officers found a large black bag filled with dirty laundry. A black fanny pack was discovered in the bag along with the laundry. The fanny pack contained driver's licenses, resident alien cards, credit cards, social security cards, and two checkbooks.

The identity evidence in this case is not so weak that the jury's verdict seems clearly wrong and manifestly unjust, nor can we say that the jury verdict is against the great weight and preponderance of the evidence. *Watson,* 204 S.W.3d at 417; *Johnson,* 23 S.W.3d at 11. The testimony surrounding Galvez's identification of Brown is not very strong. Both officers present during the photograph line-up could not recall if Galvez identified Brown, and Galvez admitted that he could not see Brown very well during the robbery. Amanda's identification testimony was much stronger. Amanda identified Brown during the photograph line-up, as well as in court. The circumstantial evidence discovered in Brown's truck, as well as the circumstantial evidence discovered in his motel room, also link Brown to the crimes in this case. The truck itself affirmatively links Brown to the crimes as well. Both Galvez and Amanda testified that the robbery was perpetrated by men driving a white Chevy truck, the same type of truck Brown was driving when police arrested him. We therefore conclude that viewing the evidence in a neutral light, the identification evidence is factually sufficient to sustain Brown's convictions for aggravated robbery and impersonation of a public servant. *See Apolinar v. State,* 106 S.W.3d 407, 412–13 (Tex.App.Houston [1st Dist.] 2003), *aff'd,* 155 S.W.3d 184, 191 (Tex.Crim.App.2005) (holding that evidence was factually sufficient to identify defendant as perpetrator of aggravated robbery, even though victim demonstrated memory and vision problems at trial; victim identified defendant three times at trial, witness testimony was fairly consistent in describing defendant's appearance, and officers later found knife with blade consis-

tent with defendant's arm wound); *Wimbrey v. State*, 106 S.W.3d 190, 191–93 (Tex. App.-Fort Worth 2003, pet. ref'd) (holding evidence was factually sufficient to support defendant's conviction for aggravated robbery; two employees of video store testified defendant entered store, approached counter, surreptitiously pointed gun at them, and forced them to empty contents of cash registers into bag, both employees separately identified defendant in photograph line-up two months after robbery, and both identified defendant as man who robbed store at trial); *Fluellen v. State*, 104 S.W.3d 152, 160–61 (Tex.App.-Texarkana 2003, no pet.) (holding evidence was factually sufficient to identify defendant as person who sold cocaine to undercover police officer, in prosecution for delivery of controlled substance in drug free zone; officer identified defendant as person who sold him cocaine at trial, and officer identified voice on audiotape of transaction as that of defendant).

### Motion to Suppress

In his fourth issue, Brown contends the trial court erred in denying his motion to suppress the evidence seized from the motel room because (1) the State failed to establish that Beatrice had actual authority to consent to a search of the motel room, and (2) the State failed to establish that her consent was voluntary. The State responds that Brown lacks standing to challenge the search, that the police obtained valid and voluntary consent, and that Brown was not harmed by admission of the evidence.

#### A. Facts

Immediately after arresting Brown and Jackowski, and after discovering evidence that they believed might link Brown and Jackowski to a series of robberies involving impersonation of police officers, Officer Burdick and Lieutenant Casko went to the motel where Jackowski claimed he was staying. Upon arriving, Casko went to rooms twenty-nine and thirty, which he believed were occupied by Brown and Jackowski, while Burdick confirmed with the motel manager that those rooms were occupied by individuals driving a white truck. Beatrice answered the door when Casko knocked and told him that she was staying in the room. He asked if anyone else occupied the room, she replied that no one did, and then verbally agreed to let Casko come in and look around. Casko entered the room alone to check for other occupants. He did not have his gun drawn when talking to Beatrice, but did have it in hand while looking around the corner into the bathroom for other occupants. While checking for other occupants, Casko noticed narcotics paraphernalia in plain view near the bed. He returned to Beatrice outside the room, where he was rejoined by Burdick, to request written consent to search the room.

Officer Burdick prepared, read, and explained a voluntary consent-to-search form for Beatrice and asked whether she had questions and understood the form. After she signed the consent form, officers searched the room and found a large black bag filled with dirty laundry. The officers discovered a black fanny pack in the bag along with the laundry. The fanny pack contained driver's licenses, resident alien cards, credit cards, social security cards, and two checkbooks, none of which belonged to Beatrice, Brown, or Jackowski.

#### B. Standard of Review

 We apply a bifurcated standard of review to motions to suppress, giving almost total deference to a trial court's determination of historical facts, while reviewing de novo the court's application of the law. *See Dyar v. State*, 125 S.W.3d 460, 462 (Tex.Crim.App.2003). In a motion to suppress hearing, the trial

court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given to their testimony. *State v. Ross,* 32 S.W.3d 853, 855 (Tex. Crim.App.2000); *Foster v. State,* 101 S.W.3d 490, 495 (Tex.App.-Houston [1st Dist.] 2002, no pet.). Accordingly, the trial court may believe or disbelieve all or any part of a witness's testimony, even if that testimony is not controverted. *Ross,* 32 S.W.3d at 855. If, as here, the trial court files no findings of fact, we view the evidence in a light most favorable to the ruling and will uphold a trial court's ruling on any theory of law supported by the evidence. *Estrada v. State,* 154 S.W.3d 604, 607 (Tex.Crim.App.2005).

*C. Standing*

We must first determine whether Brown has standing to contest the search. An accused has standing to contest a search under the Fourth Amendment only if he has a legitimate expectation of privacy in the place searched. *Rakas v. Illinois,* 439 U.S. 128, 144, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978); *Granados v. State,* 85 S.W.3d 217, 222–23 (Tex.Crim. App.2002). The defendant bears the burden of establishing that he had a subjective expectation of privacy in the place searched that society recognizes as reasonable. *Granados,* 85 S.W.3d at 223. Several factors are relevant to this latter determination of whether a given claim of privacy is objectively reasonable: (1) whether the accused had a property or possessory interest in the place invaded; (2) whether he was legitimately in the place invaded; (3) whether he had complete dominion or control and the right to exclude others; (4) whether, prior to the intrusion, he took normal precautions customarily taken by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim of privacy is consistent with historical notions of privacy. *Id.* This list of factors is non-

exhaustive, and no one factor alone is dispositive of a legitimate expectation of privacy. *Id.*

The State argues that because Brown claimed he was not staying in either motel room, he did not have complete dominion and control, and thus lacks standing to challenge the search. The Supreme Court has recognized that a registered guest at a hotel has a reasonable expectation of privacy in the room that he or she has rented and, consequently, is entitled to constitutional protection against unreasonable searches and seizures there. *See Stoner v. California,* 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964). The Supreme Court has also held that an overnight guest in someone's home has a legitimate expectation of privacy. *Minnesota v. Olson,* 495 U.S. 91, 98, 110 S.Ct. 1684, 1689, 109 L.Ed.2d 85 (1990). This court concluded in *Wilson v. State,* based on the preceding Supreme Court precedent, that an overnight guest of a registered hotel guest shares the registered guest's reasonable expectation of privacy in the room. 98 S.W.3d 265, 268–70 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd).

Here, Officer Burdick testified that he spoke with the motel manager before police searched the room, and that the manager confirmed that Brown and Jackowski had rented rooms twenty-nine and thirty and had been staying there about a week. Brown testified that he had rented the rooms so Jackowski and Sanchez could stay there, and so he could have sexual relations with his wife Beatrice. Beatrice testified that she had been staying in one of the rooms with Jackowski and Sanchez, and Brown would meet her there. Because Brown was the registered motel guest and had stayed overnight in the room to spend time with his wife, he had a legitimate expectation of privacy in the room. *See id.* at 269. Accordingly, we

conclude Brown has standing to contest the search.

### D. Authority to Give Consent

 Brown contends the fruits of the warrantless search of his motel room should have been suppressed because Beatrice lacked actual authority to consent to the search. A warrantless search by law enforcement officers does not violate the Fourth Amendment's guarantee against unreasonable searches and seizures if the officers have obtained the consent of a third party that possesses common authority over the premises or effects sought to be inspected. *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). "Common authority" rests on "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 171 n. 7, 94 S.Ct. at 993 n. 7. If consent was not obtained from someone with actual authority to consent to a search, a search may nevertheless be proper if the person giving consent had apparent authority. *Illinois v. Rodriguez,* 497 U.S. 177, 188–89, 110 S.Ct. 2793, 2801, 111 L.Ed.2d 148 (1990). A third party's consent is valid if the facts available to the officer at the time of the search would warrant a person of reasonable caution in believing that the consenting party had authority over the premises. *See id.* at 188, 110 S.Ct. at 2801. If an officer reasonably believed that the third party had common authority over the place to be searched, then his good faith mistake will not invalidate the search. *Id.* This deference does not mean, however, that the officer may rely on consent given in ambiguous circumstances or when it appears clearly unreasonable to believe the third party is clothed with authority to give consent. *Riordan v. State,* 905 S.W.2d 765, 771 (Tex.App.-Austin 1995, no pet.).

Here, Lieutenant Casko testified that when he knocked on the door to room thirty, Beatrice answered the door. Casko asked her if she was staying in the room, and she told him that she was. He asked her if there was anyone else in the room with her, and she replied that there was not. He then asked for verbal consent to search the room for other people, which she granted. While checking for other individuals in the room, Casko noticed drug paraphernalia on the table in plain view. When Officer Burdick arrived, he asked Beatrice for her written consent to search the room. Burdick testified that he knew several people were staying in the room, one of whom was Brown's wife, Beatrice. Based on this evidence, Beatrice had at least apparent authority to consent to a search of the premises.

The Supreme Court recently held, in *Georgia v. Randolph,* "that a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." 547 U.S. 103, ——, 126 S.Ct. 1515, 1528, 164 L.Ed.2d 208 (2006). There, Randolph's wife called the police over a domestic dispute. *Id.* at 1519. When police arrived, Randolph's wife told them that Randolph used drugs and had drugs inside the house. *Id.* Police asked Randolph for consent to search the house, and he expressly refused. *Id.* Police then asked Randolph's wife for consent to search, which she granted. *Id.* The Supreme Court held that Randolph's refusal to consent trumped his wife's consent. *Id.* at 1526. The present case is distinguishable, however, because Brown was not present when police asked Beatrice for consent, and he did not expressly refuse consent prior to Beatrice giving consent. We conclude Beatrice had apparent authority to consent to the officers' search of the motel room.

### E. Voluntariness of Consent

 Brown next argues that even if Beatrice had authority to consent to the

search, her consent was involuntary. When relying upon consent to justify the lawfulness of a search, the State has the burden to prove by clear and convincing evidence that the consent was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968); *see also Corea v. State,* 52 S.W.3d 311, 316 (Tex.App.-Houston [1st Dist.] 2001, pet. ref'd). The burden requires the State to show that the consent was positive and unequivocal, and there was no duress or coercion. *Meeks v. State,* 692 S.W.2d 504, 509 (Tex.Crim.App. 1985); *Riordan,* 905 S.W.2d at 770. The burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. *See Bumper,* 391 U.S. at 548–49, 88 S.Ct. at 1791–92. The validity of consent to search is a question of fact to be determined from all the circumstances. *Rayford v. State,* 125 S.W.3d 521, 528 (Tex. Crim.App.2003).

Here, Lieutenant Casko testified that he was alone when Beatrice answered the motel room door, and that she gave verbal consent to search for other individuals who might be in the room. Casko testified that he may have had his weapon drawn when he looked in the bathroom, but that he never pointed it at Beatrice, and that the other officers never had their weapons drawn. After he noticed some drug paraphernalia in plain view, Casko took Beatrice outside where Officer Burdick asked her to sign a consent to search the room. Burdick testified that he and Casko were the only officers near Beatrice when she signed the consent. He testified that she did not appear to be intoxicated, that she could and did read the consent, that she could and did speak English, and that he read and explained the consent form to her before she signed it, including a statement that she did not have to give consent. Both officers testified that she was not under arrest at the time she signed the consent, and that she was at all times

cooperative with their investigation. We hold that Beatrice's consent was voluntary, and thus the search of the motel room was valid. Accordingly, we overrule Brown's fourth issue.

## Extraneous Offenses

■ Brown contends the trial court erred in admitting testimony regarding an extraneous offense allegedly committed by Brown because the State failed to prove Brown had committed the offense beyond a reasonable doubt. The State contends Brown failed to preserve error on this issue for appeal. To preserve an issue for appeal, a party must timely object, stating the specific legal basis. TEX.R.APP. P. 33.1(a)(1); *Rhoades v. State,* 934 S.W.2d 113, 121, 127 (Tex.Crim.App.1996). "To be timely, an objection must be raised at the earliest opportunity or as soon as the ground of objection becomes apparent." *Penry v. State,* 903 S.W.2d 715, 763 (Tex. Crim.App.1995). In the absence of a timely motion or objection, nothing is presented for appellate review. *Cooper v. State,* 500 S.W.2d 837, 841 (Tex.Crim.App.1973). Here, in a hearing outside the presence of the jury, defense counsel objected to allowing the witnesses to identify Brown in court, which the trial court sustained. Counsel then objected to allowing any testimony by one of the witnesses, without giving a basis for the objection, and without obtaining a ruling. Twice after the witnesses had finished testifying, counsel objected that the testimony was not relevant, and that its probative value was outweighed by its prejudicial effect. Counsel never objected that evidence of the offenses should be excluded for failure to demonstrate Brown's involvement beyond a reasonable doubt. Thus, this argument has not been preserved for appeal.

## Conclusion

We hold (1) the trial court did not err in denying Brown's motion to suppress be-

cause police obtained voluntary consent to search the motel room from someone with apparent authority, (2) the evidence is legally and factually sufficient to support Brown's conviction for impersonating a public servant, and (3) Brown failed to preserve error on his argument that the extraneous offenses should not have been admitted because they were not proven beyond a reasonable doubt. Accordingly, we affirm the judgment of the trial court in cause number 990262 (appellate cause number 01–05–00075–CR) as to Brown's conviction for impersonating a public servant. We further hold that the evidence is legally and factually sufficient to support Brown's conviction for aggravated robbery. Accordingly, we affirm the judgment of the trial court in cause number 990261 (appellate cause number 01–05–00074–CR) as to Brown's conviction for aggravated robbery.