**Opinion issued July 5, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00189-CR

————————————

**SAMUEL AGUIRRE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 180th District Court**
**Harris County, Texas**
**Trial Court Case No. 1270699**

---

## MEMORANDUM OPINION

After the trial court denied his motion to suppress evidence, Samuel Aguirre

pled guilty to possession of a controlled substance, namely, marihuana weighing in

excess of fifty pounds but less than two thousand pounds, a second-degree felony.

TEX. HEALTH & SAFETY CODE ANN. § 481.121(b)(5) (West 2010).  The trial court

assessed punishment at five years' confinement probated to ten years. On appeal, Aguirre contends that the trial court erred in denying his motion to suppress. We hold that the trial court did not abuse its discretion in denying Aguirre's motion to suppress. We therefore affirm.

## Background

Houston police officers began surveillance of Aguirre's house pursuant to a tip that he was involved in drug trafficking. During their surveillance, the officers observed a man, later identified as Charles Correll, approach Aguirre's house and leave with a white plastic bag. A group of officers followed Correll as he drove away from Aguirre's house. After Correll changed lanes without signaling, they pulled him over for a traffic stop. During the stop, the officers uncovered one pound of marihuana and arrested Correll. Correll confessed that he had bought the marihuana from Aguirre and that Aguirre's cousin had delivered the marihuana to him earlier that day at Aguirre's house.

Based on the information obtained from Correll during the traffic stop, the officers suspected that Aguirre had marihuana in his house. Police searched Aguirre's house, recovered 388 pounds of marihuana, and arrested Aguirre.

At a hearing on Aguirre's motion to suppress, Officer Moreno testified that six officers approached Aguirre's house around 4:30 in the afternoon to conduct the "knock-and-talk" and to obtain his consent to search his house. Three officers

2

positioned themselves in front of the garage, and three officers, including Officer Moreno, went to the front door. Officer Moreno testified that he knocked on Aguirre's door, identified himself as law enforcement, and stated that he was conducting an investigation related to a marihuana sale. Aguirre opened the door to speak with the officers, and Officer Moreno asked Aguirre to step outside. Aguirre complied. Upon Officer Moreno's request, the other occupants of the house—Aguirre's wife, children, and a cousin—also exited the house.

Officer Moreno spoke with Aguirre in Spanish and advised him that the officers had been conducting surveillance on Aguirre's house and had recovered a pound of marihuana from Correll, who had identified Aguirre as his marihuana dealer. According to Officer Moreno, Aguirre acknowledged that the house was his and consented to its search, stating that he had "no problem" with a search, but he wanted to speak with his wife. Officer Moreno agreed to let Aguirre to talk with his wife. According to Officer Moreno, the officers remained outside of Aguirre's house until he gave his verbal consent to search the premises.

After obtaining Aguirre's verbal consent, Officer Moreno and Aguirre returned inside Aguirre's house, where Aguirre signed a Spanish language consent form evidencing his consent to the search. Officer Moreno then asked Aguirre if there was any marihuana in the house; Aguirre replied that an undetermined amount of marihuana was in his garage and that someone had asked him to store it.

3

When Officer Moreno asked Aguirre if he had sold any marihuana that day, Aguirre replied that he had sold a pound of marihuana in exchange for $400. The officers searched Aguirre's house. They recovered eighty-eight pounds of marihuana from Aguirre's garage and 300 pounds of marihuana from Aguirre's utility room.

According to Officer Moreno, Aguirre was not coerced to consent to the search; the officers did not approach Aguirre's house with their guns drawn and did not threaten Aguirre. When asked on cross-examination whether he had threatened that he would take Aguirre's wife to jail if Aguirre did not sign the consent form, Officer Moreno replied that he had not.

Aguirre testified to a different encounter. According to Aguirre, the police opened the front door to his house without his permission. After the police opened the door, they "grabbed" Aguirre's cousin and demanded that Aguirre exit the house. Each of the officers had their gun drawn. Aguirre exited the house. The officers then forced Aguirre to his knees and searched his pockets. Aguirre returned with the officers into the house. According to Aguirre, Officer Morneo placed a Spanish language consent form before him and told Aguirre that he would take Aguirre's wife and children to jail if Aguirre did not sign the form. Aguirre testified that he signed the form in response to Moreno's threat.

4

On cross-examination, the State elicited testimony from Aguirre about the consent form. Aguirre testified that he can read and write in Spanish, and that he knew that the consent form authorized the police to search his house. He admitted, however, that he did not read the consent form before he signed it.

Aguirre's twelve-year-old son, S.A., also testified at the suppression hearing. He recalled that the police had opened the door to the house with their guns pointed in the air. The police then entered the house and demanded that everyone exit it. S.A. conceded that he felt badly that his father had been arrested and that he had talked with his father's lawyer about the case.

## Discussion

*Standard of Review*

Aguirre challenges the trial court's refusal to suppress the evidence seized from the house, claiming that the evidence was obtained in violation of article 1, section 9 of the Texas Constitution, and the Fourth and Fourteenth Amendments to the United States Constitution. *See* TEX. CONST. art. I, § 9; U.S. CONST. amend. IV, XIV.

We review the trial court's ruling on a motion to suppress for abuse of discretion. *Shepherd v. State*, 273 S.W.3d 681, 684 (Tex. Crim. App. 2008). We view the evidence in the light most favorable to the trial court's ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007) (quoting *State v. Kelly*, 204

S.W.3d 808, 818 (Tex. Crim. App. 2006)).  The trial judge is the "sole trier of fact and judge of credibility of the witnesses and the weight to be given to their testimony."  *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007).  The trial court may choose to believe or disbelieve any part or all of a witness's testimony.  *Green v. State*, 934 S.W.2d 92, 98 (Tex. Crim. App. 1996) (citing *Allridge v. State*, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991)).  We defer to a trial court's express or implied determination of historical facts, as well as to its application-of-law-to-fact questions if those questions turn on the evaluation of a witness's credibility and demeanor.  *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002); *see Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).  We sustain the trial court's ruling if it is reasonably supported by the record and correct on any theory of law applicable to the case.  *Laney v. State*, 117 S.W.3d 854, 857 (Tex. Crim. App. 2003) (citing *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002)).  Because issues of consent are necessarily fact intensive, the trial court's finding must be accepted on appeal unless it is clearly erroneous. *Meekins v. State*, 340 S.W.3d 454, 460 (Tex. Crim. App. 2011).

*Analysis*

Aguirre claims that he did not consent to the search of his house.  Alternatively, Aguirre contends that the police exceeded the scope of a valid "knock-and-talk" and "seized" him without reasonable suspicion of criminal

activity, thereby tainting his consent to the search. He claims that, because the officers "seized" him without reasonable suspicion of criminal activity, the State was required to demonstrate attenuation between the seizure and his consent.

### 1.    *Consent*

Consent is among the most well-established exceptions to the presumption that a warrantless search is unreasonable. *Johnson v. State*, 226 S.W.3d 439, 443 (Tex. Crim. App. 2007); *see Brown v. State*, 212 S.W.3d 851, 868 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). Texas courts recognize that individuals may voluntarily consent to have their homes searched and that the police are not required to have reasonable suspicion of criminal activity before asking to enter a home. *See Johnson*, 226 S.W.3d at 443; *see also State v. Perez*, 85 S.W.3d 817, 819 (Tex. Crim. App. 2002). To be constitutionally valid, consent must be voluntary. *See Rayford v. State*, 125 S.W.3d 521, 528 (Tex. Crim. App. 2003) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219–23, 93 S. Ct. 2041, 2043–46 (1973)); *see also Brimage v. State*, 918 S.W.2d 466, 480 (Tex. Crim. App. 1994) ("When the State has secured the voluntary consent to a warrantless search, such a search violates neither the United States or Texas constitutions, nor the laws of this state.") (citing *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988 (1974); *Becknell v. State*, 720 S.W.2d 526 (Tex. Crim. App. 1986); *Sharp v. State*, 707 S.W.2d 611 (Tex. Crim. App. 1986)).

7

Generally, "whether consent is voluntary turns on questions of fact and is determined from the totality of the circumstances." *Rodriguez v. State*, 313 S.W.3d 403, 406 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *see Rayford*, 125 S.W.3d at 528 (citing *Ohio v. Robinette*, 519 U.S. 33, 40, 117 S. Ct. 417, 421 (1996)); *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002). We may consider: (1) the defendant's age, education, and intelligence; (2) the length of the detention; (3) any constitutional advice given to the defendant; (3) the repetitiveness of questioning; (4) the use of physical punishment; (5) whether the defendant was arrested, handcuffed, or in custody; (6) whether *Miranda* warnings were given; and (7) whether the defendant had the option to refuse to consent. *Cisneros v. State*, 290 S.W.3d 457, 464 (Tex. App.—Houston [14th Dist.] 2009, pet. dism'd) (citing *Reasor v. State*, 12 S.W.2d 813, 818 (Tex. Crim. App. 2000) and *Flores v. State*, 172 S.W.3d 742, 749–50 (Tex. App.—Houston [14th Dist.] 2005, no pet.)).

The record supports the trial court's implied finding that Aguirre consented to the search. Officer Moreno testified that Aguirre opened his front door in response to a "knock-and-talk." Three officers stood before Aguirre when he opened the door. The officers were armed, but did not have their guns drawn. They asked Aguirre if he would step outside, and Aguirre agreed to talk with the officers in his front yard. Aguirre was not placed under arrest at the time he gave

8

his consent. These factors weigh in favor of the state. The duration of the encounter also favors the trial court's conclusion that Aguirre voluntarily consented to the search. The officers approached Aguirre's house around 4:30 to conduct the "knock-and-talk" and obtained his written consent to search the house at 4:40. Therefore, the encounter was short. Aguirre can read and write in Spanish and signed a Spanish language consent form. Although Aguirre testified that he did not read the form because Officer Moreno had threatened him, the trial court, as fact-finder, was free to believe Officer Moreno's testimony and disbelieve Aguirre's testimony. *See Martinez v. State*, 17 S.W.3d 677, 683 (Tex. Crim. App. 2000) (en banc) (although testimony disputed by defendant, "[t]estimony by law enforcement officers that no coercion was involved in obtaining the consent is also evidence of the consent's voluntary nature."). The fact that Aguirre gave written consent further tends to show that his consent was unequivocal. *See Lackey v. State*, 638 S.W.2d 439, 452 (Tex. Crim. App. 1982).

Aguirre cites *Grimaldo v. State* to contend that the search was illegal. 223 S.W.3d 429 (Tex. App.—Amarillo 2006, no pet.). But its facts are inapposite. In *Grimaldo*, the officers knocked and entered the residence without a warrant or probable cause, and they conducted a sweep of the interior of the house. *Id.* at 433–34. Only after discovering the defendant in a back hallway did they seek his consent to search. *Id.* at 432. The Amarillo Court of Appeals concluded that the

9

consent did not attenuate the taint of the unlawful entry. *Id.* at 435. In contrast, the officers searching Aguirre's home remained outside until they obtained his consent—it was not an effort to mitigate an unlawful entry.

The testimony of Officer Moreno, combined with Aguirre's signature on the consent form and the circumstances discussed above support the trial court's implied finding that Aguirre voluntarily consented to the search. We defer to the trial court's resolution of conflicting testimony, and conclude that the trial court did not abuse its discretion in denying Aguirre's motion to suppress on the voluntariness ground.

### 2. Scope of "Knock-and-Talk"

Aguirre maintains the police exceeded the scope of a valid "knock-and-talk" and "seized" him without reasonable suspicion of criminal activity, thereby tainting his consent to the search. He claims the officers "seized" him when they asked him to exit his house, questioned him outside, and separated him from his family members. He claims that this illegal seizure taints his consent, and the State was, therefore, required to demonstrate sufficient attenuation between the time that he was illegally seized and the time that he gave his consent. *See Brick v. State*, 738 S.W.2d 676, 681 (Tex. Crim. App. 1987).

A police officer may enter upon residential property and knock on the home's front door for the purpose of asking the occupant questions, as long as a

10

person in possession of property has not made express orders prohibiting trespass. *Perez*, 85 S.W.3d at 819; *Cornealius v. State*, 900 S.W.2d 731, 733–34 (Tex. Crim. App. 1995); *Duhig v. State*, 171 S.W.3d 631, 635 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). Federal and state laws provide that a law enforcement officer may approach a citizen in a public place or knock on a door to ask questions or seek consent to search. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 2386 (1991); *Perez*, 85 S.W.3d at 819; *Hunter v. State*, 955 S.W.2d 102, 104 (Tex. Crim. App. 1997).

An officer need not have reasonable suspicion or a basis for suspecting a particular person to ask questions of that individual or request consent to search, so long as the officer does not indicate compliance with his request is required. *See Bostick*, 501 U.S. at 434–35, 111 S. Ct. at 2386; *see also Perez*, 85 S.W.3d at 819; *Hunter*, 955 S.W.2d at 104. Such an encounter is a consensual interaction, which the citizen is free to terminate at any time. *See Hunter*, 955 S.W.2d at 104. It is not considered a seizure and does not trigger constitutional analysis, unless the interaction loses its consensual nature. *Bostick*, 501 U.S. at 434, 111 S. Ct. at 2386; *see Hunter*, 955 S.W.2d at 104. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may a court conclude that a seizure has occurred. *Bostick*, 501 U.S. at 434, 111 S. Ct. at 2386. Courts will uphold "knock-and-talk" procedures as constitutionally

11

permissible, consensual encounters, "[s]o long as a reasonable person would feel free to disregard the police and go about his business." *Hunter*, 955 S.W.2d at 104 (quoting *Bostick*, 501 U.S. at 434, 111 S. Ct. at 2386). Whether a consensual encounter loses its consensual nature and is thereby rendered a seizure is evaluated under the totality of the circumstances; "the dispositive question is whether the officers conveyed a message to appellant that compliance with their requests was required." *Hunter*, 955 S.W.2d at 104. Citing *Grimaldo*, Aguirre complains that the officers "seized" him without reasonable suspicion of criminal activity when the officers asked him to exit his house, questioned him on his front lawn, and separated him from his family. *See Grimaldo*, 223 S.W.3d at 431–32, 435 (requiring State to prove attenuation after illegal seizure when officers obtained consent minutes after they knocked on door and, after receiving no response, forcibly entered house with guns drawn, handcuffed occupants, and forced them to lay face-down on floor).

Relying on *Carmouche v. State*, Aguirre's main argument is that the exigent circumstances dictate that the officers coerced his consent. 10 S.W.3d 323, 332–33 (Tex. Crim. App. 2000) (holding that any verbal consent to pat down that came only after officers required man to lay spread eagled across patrol car was involuntary where defendant had already been searched). But the trial court faced conflicting testimony of Aguirre's encounter with the police officers.

Aguirre testified that he exited his house and was forced to his knees and that the officers searched his pockets. According to Aguirre, he was separated from his family and did not feel free to leave the premises. Meanwhile, Officer Moreno testified to a subdued encounter: the police knocked on Aguirre's door and asked if he and his family would step outside. Aguirre complied. The police did not touch Aguirre, handcuff him, or threaten him. They permitted Aguirre to talk with his wife about the search. According to Officer Moreno, Aguirre fully understood that he was consenting to a search of his house in response to a police investigation.

Reviewing the totality of the circumstances, we conclude that the record supports the conclusion that Aguirre's encounter with the police outside his house was a consensual encounter. *See State v. Garcia-Cantu*, 253 S.W.3d 236, 243 (Tex. Crim. App. 2008) (officers are free to approach and knock on citizens' doors and ask to talk with them and such conduct does not constitute a seizure until officer engages in threatening or coercive conduct). We do not agree that asking a person to exit his house and questioning him outside of the presence of his family amounts to "conduct which a reasonable man would view as threatening or offensive." *See id.* Although he acknowledged that they were armed, Officer Moreno denied that he and his officers had their guns drawn when he knocked on Aguirre's door. Officer Moreno admitted that he could not see all of the other officers behind him, so he could not say whether they had drawn their guns. He

13

testified that no officer entered the house until he obtained Aguirre's consent. Although Aguirre testified that he felt restrained by the officers and that they engaged in a show of force by pushing him onto his knees, the officer testified that he told Aguirre "to go ahead and sit down" while everyone exited the house. And Officer Moreno specifically denied threatening that he would take Aguirre's wife to jail if Aguirre refused to consent. The trial court impliedly disregarded Aguirre's testimony and credited Officer Moreno's testimony of the encounter. As an appellate court, we give almost complete deference to a trial court's ruling on factual matters. Because Aguirre was not seized at the time he gave his consent to the search, the State was not required to prove attenuation to validate Aguirre's consent.

## Conclusion

We conclude that the trial court did not err in denying Aguirre's motion to suppress. We therefore affirm the judgment of the trial court.


Jane Bland
Justice

Panel consists of Justices Bland, Massengale, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).

14