Opinion issued July 24, 2008









 






In The

Court of Appeals

For The

First District of Texas






NOS. 01-07-00265-CR

 01-07-00266-CR

 01-07-00326-CR






TROY NORMAN VOLK, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 405th District Court

Galveston County, Texas

Trial Court Cause Nos. 05CR2898, 05CR3378, 05CR3379






MEMORANDUM OPINION


 A jury convicted appellant, Troy Norman Volk, of two counts of aggravated
sexual assault of a child and one count of aggravated kidnapping, The trial court
found the enhancement for a previous rape conviction true and sentenced appellant
to life in prison. In three issues, appellant argues that (1) the trial court erred in
denying his motion to suppress; (2) the evidence was factually insufficient to
establish identity; and (3) the trial court erred in ruling that he could not testify free
from impeachment by evidence of prior rape convictions.

 We affirm.

Background

 On the evening of November 4, 2005, Linda Carr's vehicle broke down near
the home of Norma Huerta in Texas City, Texas. Carr was accompanied by her
daughter, her four-year-old niece, and the complainant, her daughter's 11-year-old
friend. Eventually, a man in a truck stopped and offered assistance. He attempted to
jump start Carr's vehicle and asked the complainant to get in the driver's seat of his
truck in order to help in that process. The man then removed the jumper cables from
Carr's vehicle, told the complainant to move over because they were going to get a
battery, and drove off at a high rate of speed.

 Texas City Police Officer J. Collins was dispatched to the scene of the disabled
vehicle, where he learned that the complainant had been taken by a man in a truck. 
Officer Collins and other members of the Texas City Police Department (TCPD)
conducted an investigation which revealed that the complainant had been sexually
assaulted and then dropped off at a bank. The police investigation indicated that
appellant was the man who kidnapped and assaulted the complainant.

 Appellant was charged with two counts of aggravated sexual assault of a child (1)
and one count of aggravated kidnapping. (2) At trial and on appeal, appellant contended
that he was not the man who kidnapped and assaulted the complainant. A jury found
appellant guilty on all three charges, and the trial court sentenced appellant to life in
prison based on the guilty verdicts and its finding that the enhancement paragraphs
for appellant's previous convictions were true. This appeal followed.

Material Omission in Affidavit In his first issue, appellant argues that the trial court erred when it held that
material exculpatory omissions in the affidavit supporting the search warrant did not
invalidate the search and its fruits.

 TCPD executed a search warrant early in the morning on November 5, 2005,
allowing TCPD to search appellant's home and truck for evidence related to the
kidnapping and sexual assault of the complainant. The affidavit showing probable
cause in support of the search warrant was created by Detective R. Johnston, and it
included details on the location and description of appellant's home, a description of
appellant's vehicle as a "1994 Ford F-150 Pickup, burnt orange over tan in color,"
and information on the alleged offense and the specific evidence TCPD was seeking,
including photographs, fingerprints, DNA, and any other items on which such
evidence could be found including clothing and bedding. 

 The affidavit also included a narrative of events and facts pieced together from
the statements of various witnesses and from the investigation conducted by Officer
Collins and Detective Johnston. The affidavit related Officer Collins's first interview
with Carr and her daughter, in which the daughter told Officer Collins that a man
driving what she thought was a Ford F-150 with an extended cab had taken the
complainant after attempting to jump start Carr's vehicle. Carr's daughter also told
Officer Collins that the man who took the complainant was a white male with dark
hair and that he was wearing blue jeans, but she could not remember the color of his
shirt.

 The affidavit also included Officer Collins's interview with Huerta, who told
Officer Collins that she saw a truck with a child matching the complainant's general
description outside her home at the time the complainant was abducted and that the
truck was older with a silver tool box and was reddish in color. Huerta described the
driver of the truck as a white male with glasses and a mustache who was wearing dark
jeans and a dark, long-sleeved shirt.

 The affidavit stated that Officer Collins had observed a similar truck driving
a few blocks away from the site of the abduction. Officer Collins recalled that the
truck had an older, square F-150 body style and a toolbox. Officer Collins searched
the neighborhood for a similar vehicle and found a reddish, two-tone Ford F-150 with
a silver toolbox belonging to appellant at the appellant's home a few blocks away. 
Officer Collins observed that the hood of appellant's truck was very warm and that
the engine was "ticking" as if it had been driven recently. Officer Collins also
observed a set of jumper cables in the bed of the truck and observed that plates,
glasses and other dishes littered the cab of the truck.

 The affidavit then recounted Officer Collins's investigation after he was told
that the complainant had returned home. Officer Collins interviewed the complainant
at her home, and she told him that the man who took her was white, and tall, had
blondish hair, and had a mustache. The complainant told Officer Collins that the man
had told her they were going to get a battery, but instead he drove her down a street
a few blocks away from the site of the abduction to a house whose location matched
that of appellant's home, where Officer Collins had already located the truck. 
Detective Johnston personally verified that the location described by the complainant
corresponded with the location given by Officer Collins. The complainant described
the truck as having dishes inside the cab, which corresponded to the items Officer
Collins noticed in appellant's truck. The complainant also told Officer Collins that
her kidnapper led her through the garage into the house and that she heard a barking
dog. Officer Collins reported that on a second trip to appellant's home he heard a dog
barking as well. The complainant then recounted the details of the assault, and
concluded her interview with Officer Collins by stating that her kidnapper dropped
her off at a bank and she walked home. The magistrate signed the affidavit and
search warrant for appellant's home and vehicle, and TCPD officers served the
warrant and searched appellant's home and vehicle on the morning of November 5,
2005. Evidence collected by TCPD officers included photographs of the interior of
appellant's home and truck and several articles of appellant's clothing that contained
trace evidence.

 Appellant moved to suppress the search warrant and the evidence obtained
from it on the grounds that material facts were omitted from the affidavit in support
of the search warrant and, therefore, probable cause was lacking. At the suppression
hearing, appellant questioned Detective Johnston regarding the omission of several
facts, including the fact that witnesses gave inconsistent testimony regarding the color
of the truck in which the complainant was abducted and the abductor's appearance. 
Appellant pointed to the facts that the complainant described the truck as white, while
Carr's daughter told officers that the truck might have been light-blue. Appellant also
questioned why Detective Johnston failed to state in the affidavit that none of the
three witnesses had been able to identify appellant in a photo lineup and that Huerta
had not been able to positively identify appellant's truck when it was shown to her
after the fact. (3)

 When asked whether he knew of any exculpatory evidence at the time he
prepared the affidavit, Detective Johnston answered "No." Appellant then
specifically asked about Huerta's inability to identify the truck or to identify appellant
in a photo lineup and asked, "So, that would be exculpatory, right?" Detective
Johnston answered, "Is that exculpatory or inconclusive? I mean, they're not
saying--if they are not saying 'No.'" Detective Johnston also conceded that the
complainant's statement that the truck was white was possibly exculpatory, and when
appellant questioned how that information got left out of the affidavit, Detective
Johnston answered that he did not recall the exact process he used to create the
affidavit and stated, "It's not an intentional. I mean, it's nothing--I didn't--I
don't--," at which point he was interrupted by another question from appellant.

 Detective Johnston's testimony was unclear as to when exactly he learned that
the complainant failed to identify appellant in a photo lineup. Appellant asked
Detective Johnston when he had reviewed a particular officer's report, and Detective
Johnston replied that he did not recall. When asked specifically whether he knew that
the complainant viewed a photo lineup containing appellant and affirmatively stated
that her assailant was not pictured, Detective Johnston replied, "Again, back to one
of those briefings, I'm sure I was told that." Detective Johnston further testified that
he could not explain why that information was not included in the affidavit, but on
re-direct examination later, Detective Johnston affirmed that he was seeking a search
warrant for property, not for a particular person, and that he did not think the
information about the results of the photo lineup were material to the probable cause
for search of the premises. Appellant asked Detective Johnston, "[I]f all [the
exculpatory evidence] was put [in the affidavit], it may have been a different result,
correct, as far as [the magistrate] signing it or not." Detective Johnston answered,
"No, I disagree."

 Appellant did not introduce any other evidence at the suppression hearing
showing that Detective Johnston acted with intent to deceive or mislead the
magistrate by leaving out the allegedly "exculpatory" evidence, nor did appellant
introduce any evidence that Detective Johnston and the other officers investigating
the case included or excluded information in their reports or the affidavit in a way
that showed reckless disregard for the truth. The trial court denied appellant's motion
to suppress.

 Standard of Review

 The trial judge is the sole trier of fact at a suppression hearing and thus
evaluates witnesses' testimony and credibility. Torres v. State, 182 S.W.3d 899, 902
(Tex. Crim. App. 2005). The denial of a motion to suppress is reviewed for abuse of
discretion, and we give great deference to the trial court's determination of historical
facts while reviewing de novo the trial court's application of the law. Balentine v.
State, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002).

 To justify the issuance of a search warrant, the affidavit submitted in support
of the search warrant must set forth facts sufficient to establish probable cause that
(1) a specific offense has been committed, (2) specifically described property or items
to be searched for and seized constitute evidence of the offense, and (3) the property
or items constituting such evidence are located at the particular place to be searched. 
Tex. Code Crim. Proc. Ann. art. 18.01(c) (Vernon Supp. 2007); see also Blake v.
State, 125 S.W.3d 717, 723 (Tex. App.--Houston [1st Dist.] 2003, no pet.). Whether
the facts mentioned in the affidavit are adequate to establish probable cause depends
on the totality of the circumstances. Ramos v. State, 934 S.W.2d 358, 362-63 (Tex.
Crim. App. 1996).

 Analysis

 In Franks v. Delaware, the United States Supreme Court recognized that if an
affirmative misrepresentation is knowingly included in a probable cause affidavit in
support of a search warrant, and the misrepresentation is material and necessary to
establishing probable cause, the warrant is rendered invalid under the Fourth
Amendment. McKissick v. State, 209 S.W.3d 205, 212 (Tex. App.--Houston [1st
Dist.] 2006, pet. ref'd) (citing Franks v. Delaware, 438 U.S. 154, 164-65, 98 S. Ct.
2674, 2680-81 (1978)). This exclusionary rule does not extend to instances in which
the police are merely negligent in collecting the facts alleged in the affidavit. Id.
(citing Franks, 438 U.S. at 170, 98 S. Ct. at 2683).

 The Texas Court of Criminal Appeals has not yet recognized that a Franks
analysis applies to omissions as well as to false statements contained in probable
cause affidavits. Id. at 213. However, the Fifth Circuit, along with other Texas
courts of appeals, including this Court, has concluded that allegations of material
omissions are to be treated essentially the same as claims of material misstatements. 
See United States v. Martin, 615 F.2d 318, 328 (5th Cir. 1980); Blake, 125 S.W.3d
at 724; Heitman v. State, 789 S.W.2d 607, 610-11 (Tex. App.--Dallas 1990, pet.
ref'd); Melton v. State, 750 S.W.2d 281, 284 (Tex. App.--Houston [14th Dist.] 1988,
no pet.). In Martin, the Fifth Circuit held that if a defendant establishes by a
preponderance of the evidence that omissions of fact were made in a probable cause
affidavit and that such omissions were made intentionally or with reckless disregard
for the truth, the warrant will be held invalid if the inclusion of the omitted facts
would vitiate probable cause. (4) Martin, 615 F.2d at 328.

 Here, appellant fails to show that Detective Johnston intentionally omitted
material facts in order to make a finding of probable cause more likely. Detective
Johnston's testimony was that he did not believe he had made any mistakes by failing
to include certain information that he considered irrelevant to establishing probable
cause and that any mistakes that he did make were not intentional. The trial court was
within its discretion to find Johnston's testimony credible, especially in light of the
fact that police officers are frequently called on to parse inconsistent eyewitness
accounts when investigating a case. Appellant also fails to establish that Detective
Johnston's omissions were the result of a reckless disregard for the truth that rose to
the same level as the case cited by appellant. See Davis v. State, 144 S.W.3d 192,
202-03 (Tex. App.--Fort Worth 2004, pet. ref'd) (finding insufficient probable cause
when affidavit contained affirmative misstatements and investigating officer relied
on informant he did not know and had not met in person, and when officer failed to
clarify or independently investigate informant's claims); see also McKissick, 209
S.W.3d at 212 (holding exclusionary rule does not extend to instances in which police
are merely negligent in collecting facts alleged in affidavit).

 Furthermore, appellant fails to show that the inclusion of the facts he cites
would render the affidavit, read as a whole, insufficient to show probable cause. See
McKissick, 209 S.W.3d at 213 (citing Blake, 125 S.W.3d at 724). The affidavit
included Huerta's testimony regarding the truck's color and corroborating testimony
from other witnesses regarding other identifying characteristics of the truck. The
affidavit also included all of the other previously discussed details of Officer
Collins's investigation. This evidence was sufficient to establish probable cause that
a specific crime had been committed and that the specific property or items sought by
TCPD constituting evidence were located in appellant's house and truck. See Tex.
Code Crim. Proc. Ann. art. 18.01(c). We conclude that a magistrate who knew that
other eyewitnesses had given different descriptions of the abductor or vehicle
involved and that the complainant had not been able to identify appellant in a photo
line-up could nevertheless have reasonably found the affidavit sufficient to show
probable cause. See McKissick, 209 S.W.3d at 213; see also Garza v. State, 161
S.W.3d 636, 640-41 (Tex. App.--San Antonio 2005, no pet.) (upholding warrant
when affidavit omitted reference to fact that witness gave conflicting testimony to
police when initially interviewed).

 We overrule appellant's first issue.

Factual Sufficiency

 In his second issue, appellant argues that the evidence presented at trial was
factually insufficient to identify him as the man who committed the kidnapping and
sexual assault of the complainant.

 At trial, the State presented the testimony of the complainant. She testified that
it was getting dark at the time Carr's vehicle broke down. The complainant described
the man who stopped to help as having slicked back, dirty blond hair, glasses, and a
mustache. She described his truck as orange with a tool box. The State asked, "Now,
do you remember when you were talking to the police originally, do you remember
that you told the officer that the truck was a different color?" The complainant
answered, "No." She also stated that the truck had plates with flowers on them inside
the cab and that the truck was "medium sized" and had two doors.

 The complainant testified that the man told her to get in the driver's seat in
order to help him jump start Carr's vehicle, which she did, and then he told her to
move over to the passenger seat because they had to get a battery for Carr. The
complainant described the route driven by the man to a house a few blocks away and
testified that he opened the garage door from inside the truck using a garage door
opener. She stated that the house was white with a two-door garage, a brown front
door, and a flower pot with flowers on the ground by the garage door. The
complainant also testified that she saw a pile of "wood[,] beds, and sheets, and junk"
piled up in the garage.

 The complainant testified that the living room of the house had a fish tank, two
big mirrors and a TV. She also testified that she saw a dog that was "furry and mixed
with brown, light brown and black." She testified that the man led her down a hall
to a bedroom and told her to take her clothes off. At that point, she testified that she
tried to leave through the door to the garage, but that when she pressed the button to
open the garage door, it would not open. The man then "choked her" and told her that
"if [she] didn't do what he said then he was going to suffocate [her]." The man took
her to a room that she described as having a dresser with its back toward the door and
a TV on top. She then described the assault, indicating that the man penetrated her
orally, vaginally, and rectally. She stated that after it was over, she used the bathroom
and got dressed, and the man dropped her off at a bank. She then walked home. The
State showed the complainant a series of photographs that she identified as places
inside the house where she was assaulted.

 On cross-examination, appellant questioned the complainant about the various
people to whom she spoke about the assault, including her mother and the police. 
Appellant also asked several questions regarding her previous statement that the truck
was white, but the complainant consistently stated that she did not remember saying
that the truck was white. He also emphasized the facts that she described the man
who kidnapped her as having blond hair and that she described the house she was
taken to as white. Appellant also questioned her description of the inside of the house
and the timing of when she was shown the photographs taken by police. The
complainant testified that she did not describe any of the features inside the house
until she was interviewed by police officers. On re-direct examination, the
complainant stated that she remembered talking to a police detective before she was
shown the pictures of the inside of the house and that she could not remember what
they discussed, but that she did not give the detective any details about the inside of
the house before she saw the pictures.

 Carr's daughter also testified to the details of the complainant's abduction and
gave a description of the truck in which the complainant was taken. She stated that
she thought the truck was blue and gray, but that she was not positive. She also
testified that the truck was an older two-door extended cab pickup and had a silver
tool box on the back. She testified that police later showed her appellant's truck and
asked if it looked like the truck in which the complainant was taken. Carr's daughter
testified that she told police she was pretty sure that it was the truck she saw, but that
she was not certain. She described the man who abducted the complainant as wearing
a long-sleeved blue shirt. However, she was not able to identify anyone in a
photographic lineup that looked like the person who drove the truck.

 Huerta testified at trial that she observed an older, two door, "reddish-orange"
truck with a tool box stop near Carr's vehicle. The truck driver pulled out a pair of
jumper cables and looked like he was attempting to help Carr start her vehicle. 
Huerta testified that she saw the complainant sitting in the driver's seat of the truck,
and then saw the man walk up to the driver's side and say something to the
complainant. When she looked again, the truck and the complainant were gone. She
described the man as tall with dark brown or black hair that was combed back and a
mustache, and she said that he was wearing black round glasses, dark pants, and a
dark shirt. 

 Huerta testified that the police eventually drove her to a house a few blocks
away and asked her if the truck there looked like the truck she observed earlier, and
she told the officers that it "really look[ed] like the truck," but that due to a lack of
lighting, she could not be certain. The police allowed her to stay and look at the truck
for a few minutes, and she told them she was "pretty sure" that was it, but again stated
that she could not be "one hundred percent sure." Huerta also testified that the police
showed her a photo lineup. Her testimony revealed that she identified the man that
she thought "kind of looked like the man [she] saw that night" but could not be sure
because the hair and glasses were different. The State later established that the man
Huerta tentatively identified was appellant.

 Officer Collins testified to the same facts that were included in the affidavit for
the search warrant, recounting his efforts in interviewing witnesses and the
complainant and the details of finding appellant's home and truck. He also testified
that he believed some details in the complainant's description of appellant's home
and truck, like her description of the inside of the truck, were consistent with what he
found, and some were not.

 Sergeant J. Stanton testified about the details of the investigation once the
police received the search warrant and attempted to search appellant's home. He
testified that TCPD officers surrounded appellant's home and that the officers
repeatedly knocked on the front door. After approximately 15 minutes, a light came
on inside the house, and it stayed on for approximately two minutes. Sergeant
Stanton testified that about 30 to 45 minutes after the light went off, appellant came
out of the residence. Sergeant Stanton described the man who came out the home as
a white male who was wearing glasses, and, at trial, he identified the man as
appellant. He also testified that appellant's mustache looked "unusual" when he
answered the door, stating, "It was half-shaven. There were splotch marks on it and
shaved in a hurry like trying to shave a mustache." He also identified pictures of
appellant as he looked at the time his home was searched.

 Sergeant Stanton testified that officers discovered a dog at appellant's
residence, which he described as a "Collie mix with fluffy hair," and he said that the
dog was "[k]ind of brown gray, a multi-colored dog." Sergeant Stanton further
testified about what TCPD officers found inside the house. He stated that he
observed an octagonal fish tank, a wall that was covered in mirrors, and a dresser in
the master bedroom that "looked like it was used to separate the inside of the
bedroom." Sergeant Stanton testified that he found what he assumed was hair that
appellant had shaved off in the master bathroom in the toilet area, and he identified
that bathroom as the room where the light had come on previously while police were
waiting for appellant to come out of the house. Sergeant Stanton described
appellant's garage as "cluttered" and observed some two-by-fours next to a pile of
other things in the garage.

 Sergeant Stanton also observed a door handle with a rag draped over it and a
bottle of cleaning fluid on the kitchen table. Sergeant Stanton identified photos taken
by the police that depicted the things he observed in appellant's house, including the
pile of boards and other items in the garage, the living room with the octagonal fish
tank, mirrors, a big screen television, the master bedroom with the dresser, the
bathroom with close-ups of the hair, the rag draped over the door knob, and the
cleaning fluid on the kitchen table. He also testified that nothing except the
doorknobs looked as if it had been cleaned recently.

 Sergeant Stanton then testified that he went back to the police station and
conducted an interview with the complainant. He testified that he conducted a pre-interview, as he customarily did in situations like this, to get to know the individual
to be interviewed, to assess her mental well-being and ability to participate in a video-recorded interview. He stated that the complainant gave him information on the case
and that he took some handwritten notes while she talked. He then conferred with
other detectives, and they decided to go ahead with the video-recorded interview. He
testified that in the interview, "[The complainant] was shown the pictures . . . and
then she commented on the pictures."

 After the complainant's testimony regarding this interview, Sergeant Stanton
clarified what happened regarding the photos of appellant's residence and the pre-interview. Sergeant Stanton testified that he had not yet shown her pictures of the
inside of the residence, and he read from the notes he took during the pre-interview. 
His notes demonstrated that the complainant told him about the big mirror wall, the
presence of the dog, the big screen television and fish in the living room, and a
description of the man who abducted her. He also testified that he did not write down
everything the complainant said. He testified that during the video-recorded
interview, the complainant was shown pictures of the interior of the house and that
she pointed out items that she recognized.

 Sergeant Stanton also testified about the photo lineups. The State asked, 

If a detective puts together a photo line-up that includes an individual
and you later realize that individual does not look like the photo used in
the photo line-up, why would you then not put together another photo
line-up with a more accurate picture and show it to the witnesses?


Sergeant Stanton responded that it was unethical to do so because once a witness has
seen one line-up, she could be influenced when looking at the second line-up to point
out someone she recognized from the first line-up.

 Officer H. Bierry, the identification officer who took photographs and collected
other evidence from appellant's house, testified that he collected a black turtleneck
shirt, a white long-sleeved crew neck shirt, and a pair of black jeans from the floor
of appellant's master bedroom. These items were taken to be tested for trace
evidence. Officer Biery testified that he was unable to lift any fingerprints from the
doors because they were completely clean, and he testified that it was unusual to fail
to find even a smear or partial fingerprint. He also testified that appellant's prints
were not found on Carr's vehicle and that no usable prints were found on appellant's
truck.

 The State also presented the testimony of the Sexual Assault Nurse Examiner
and the pediatrician who examined the complainant. They both testified to physical
evidence that supported their conclusion that the complainant had been the victim of
a sexual assault. The nurse examiner testified that the complainant told her that the
man who assaulted her had choked her and had penetrated her orally, vaginally, and
rectally. The doctor testified that the complainant told him that the man who
assaulted her was white and had blond hair and a mustache and that he drove a white
truck with a long tool box and dishes inside. The complainant also told the doctor
that the man who assaulted her choked her and "put his private in her front and back
privates" and that she tried to escape but could not get out through the garage door.

 Kristy Wimsatt, a forensic scientist, testified regarding DNA evidence. She
testified that she did not find any of appellant's DNA on any of the evidence collected
in this case. She testified that it was possible for the complainant's DNA to "mask"
any DNA left by the man who assaulted her and that it was possible for a sexual
assault to occur and not leave any DNA evidence. She also testified that urinating
and wiping would impact the evidence that would be found on a victim.

 Devin Stasicha, a trace evidence analyst, testified regarding fibers that were
found on the complainant's and appellant's clothing. She testified that fibers
consistent in type and color with appellant's black turtleneck and jeans were found
on the complainant's shirt, shorts, and underwear. She also testified that fibers
consistent in type and color with the complainant's shirt were found on appellant's
black jeans, black turtleneck, and white crew neck shirt. Stasicha testified that
appellant's clothing would have had to come into contact with a shirt with the same
color and fiber type as the complainant's shirt, and vice-versa, in order to get the
results she observed.

 Standard of Review

 Factual sufficiency analysis is broken down into two prongs. First, we must
ask whether the evidence introduced to support the verdict, although legally
sufficient, is so weak that the jury's verdict seems clearly wrong and manifestly
unjust. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006) (quoting
Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)). Second, we must ask
whether, considering the conflicting evidence, the jury's verdict, although legally
sufficient, is nevertheless against the great weight and preponderance of the evidence. 
Id. at 415. In conducting this review, we view all of the evidence in a neutral light. 
Id. at 414. We are also mindful that a jury has already passed on the facts, and that
we cannot order a new trial simply because we disagree with the verdict. Id. What
weight to give contradictory testimonial evidence is within the sole province of the
jury because it turns on an evaluation of credibility and demeanor. Cain v. State, 958
S.W.2d 404, 408-09 (Tex. Crim. App. 1997). Therefore, we must defer appropriately
to the fact finder and avoid substituting our judgment for its judgment, and we may
find evidence factually insufficient only when necessary to prevent manifest injustice. 
Id. at 407; see also Johnson, 23 S.W.3d at 12.

 Analysis

 In his second issue, appellant complains that the evidence presented at trial was
factually insufficient to identify him as the man who kidnapped and assaulted the
complainant.

 The State presented the testimony of several witnesses who gave descriptions
of the assailant and his truck that matched the descriptions of appellant and his truck. 
The State also presented the testimony of the complainant, who identified several
features of the inside of appellant's home that were corroborated by the photographs
taken by police. The State presented evidence that indicated a likelihood that
appellant's and the complainant's clothing had come in direct contact. The State also
presented evidence of the conditions the police found at appellant's home while
executing the search warrant, including evidence that appellant delayed answering the
door for more than a half-hour, that it appeared appellant had recently shaved his
mustache, and that all of the door knobs in the house appeared to have been recently
cleaned. We cannot conclude that the evidence introduced by the State is so weak
that the jury's verdict seems clearly wrong and manifestly unjust. See Watson, 204
S.W.3d at 414-15.

 Appellant points to the lack of fingerprint and DNA evidence. However, the
State introduced the testimony of Sergeant Stanton regarding the presence of cleaning
fluid and a rag draped over a door knob and his observation that the door knobs were
the only part of the home that appeared to have been cleaned recently. The State also
presented Kristy Wimsatt's testimony regarding possible reasons for the lack of DNA
evidence. The jury was free to find Sergeant Stanton's and Wimsatt's testimony
credible. See Cain, 958 S.W.2d at 408-09; see also Stevens v. State, 234 S.W.3d 748,
779-80 (Tex. App.--Fort Worth 2007, no pet.) (holding evidence was factually
sufficient to support murder conviction even though no eyewitness testimony, no
confession, no fingerprints, no DNA, no blood stains, no motive, and no evidence of
prior violence by appellant was presented by the State); Parker v. State, 192 S.W.3d
801, 806 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd) (holding evidence was
factually sufficient when appellant's fingerprints were not found on contraband
materials). Thus we conclude that the lack of DNA evidence does not make the
evidence factually insufficient.

 Appellant also argues that the evidence was factually insufficient because no
witness positively identified him as the complainant's abductor, either in a photo line-up or at trial. Appellant cites Brown v. State to support his contention. 212 S.W.3d
851, 864-66 (Tex. App.--Houston [1st Dist.] 2006, pet. ref'd). In Brown, the court
noted irregularities in the complainant's identification of the appellant in a photo line-up because the complainant only identified the appellant after he saw his wife's
indication that the appellant was one of the men who had robbed them, and the other
evidence linking appellant to the crime was largely circumstantial. Id. However, this
Court upheld the legal and factual sufficiency of the evidence against the appellant
in Brown on the basis of the second complainant's identification of the appellant and
the circumstantial evidence against him. Id.

 Similarly, here the State presented circumstantial evidence linking appellant
to the kidnapping and assault of the complainant, and it also presented the testimony
of several witnesses who were at least tentatively able to identify appellant or his
truck. Appellant argues that this evidence was too weak to support his convictions
because the complainant consistently testified that her assailant was blond, while
appellant was dark-haired. Although the complainant testified inconsistently, Huerta
testified that the man who kidnapped the complainant had dark, slicked back hair, and
the complainant confirmed that the pictures of appellant's house depicted the place
where she was assaulted. See Sharp v. State, 707 S.W.2d 611, 614 (Tex. Crim. App.
1986) (holding that witness's failure to identify appellant goes only to the weight of
identification evidence). Furthermore, the complainant's description of appellant's
person was consistent except with regard to hair color.

 Appellant attempted to discredit the complainant's description of his house
both at trial and on appeal by arguing that she was shown the photographs of
appellant's home before she testified to any details about it. The evidence shows that
the jury heard conflicting evidence, and it was free to believe Sergeant Stanton's
testimony that the complainant gave details about the inside of the house before he
showed her the pictures. See id. The jury was also free to find the complainant's
description of the inside of appellant's house credible regardless of whether she saw
the photos before or after she identified the characteristics of the house where she was
assaulted and to find that her testimony in general was consistent and credible. See
id.

 Furthermore, appellant points out that the complainant wrongly described his
house as "white" when only the garage doors were white. Appellant also points to
the fact that the complainant originally stated that the truck used in her kidnapping
was white, and he complains that the fiber evidence was too weak to support his
conviction because Stasicha testified that the fibers could have come from other
sources of the same type and color. However, all of this evidence and conflicting
testimony was presented to the jury at trial, and it was the sole judge of credibility. 
See Cain, 958 S.W.2d at 408-09. The jury was free to decide whose testimony
seemed most credible. Cain, 958 S.W.2d at 408-09. 

 Appellant's arguments also ignore the fact that the jury heard evidence that
appellant changed his appearance by shaving his mustache, had recently cleaned the
door knobs in his home, and delayed letting the police into his home for at least a
half-hour after they first announced their presence outside his home. Such evidence
could be interpreted as consciousness of guilt on the part of appellant and would have
served to reduce the credibility of appellant's defensive theories. See Torres v. State,
794 S.W.2d 596, 598 (Tex. App.--Austin 1990, no pet.) (holding that evidence
indicating "consciousness of guilt" can be strong evidence tending to prove that the
accused committed the act with which he is charged).

 Because the determination of credibility was placed in the hands of the jury,
the weight it chose to give to or withhold from each element in seeking resolution of
this case was solely within its province. See Cain, 958 S.W.2d at 408-09. We must
defer appropriately to the fact finder and avoid substituting our judgment for its
judgment, and we may find evidence factually insufficient only when necessary to
prevent manifest injustice. Id. at 407. Even considering the conflicting evidence
raised by appellant, the jury's verdict is not against the great weight and
preponderance of the evidence. Watson, 204 S.W.3d at 415.

 We overrule appellant's second issue.

Appellant's Right to Testify Free of Impeachment

 In his third issue, appellant argues that the trial court erred in ruling that
appellant could not testify free from impeachment by evidence of prior rape
convictions. The State argues that appellant failed to preserve this error for review. 
We agree.

 Appellant was already a registered sex offender at the time of trial because of
two previous rape convictions from 1984 and 1985. Appellant also had prior
convictions for possession of a controlled substance in 1997 and assault in 1990. The
State filed a Notice of Intent to introduce appellant's prior convictions to impeach
him if he took the stand to testify. Appellant filed a Motion to Testify Free from
Impeachment by Prior Convictions, and based his argument on Theus v. State, 845
S.W.2d 874, 880-81 (Tex. Crim. App. 1992).

 During the trial court's hearing on appellant's motion to testify free from
impeachment, the State informed the trial court that it intended to use the rape
convictions, the possession of a controlled substance, and the assault convictions for
impeachment. Appellant argued against the introduction of the rape convictions due
to the prejudice a prior conviction for rape would cause in a prosecution for sexual
assault. The trial court denied appellant's motion, ruling that the probative value of
the rape convictions outweighed any unfair prejudice and said that "the Court will
permit the impeachment of the testimony in the case, if it comes up. 
Something--okay. We'll leave it at that. I don't know I need to rule on this motion
other than I have had the hearing at this point." The trial court went on to clarify that
the only explicit ruling it had made at that time was to grant appellant's request for
a hearing on its Motion to Testify Free from Impeachment by Prior Convictions. 
Appellant did not testify at trial and did not make any record of what his testimony
would have included.

 Standard of Review

 We review a trial court's decision to admit prior convictions for a clear abuse
of discretion. Theus, 845 S.W.2d at 881. A defendant must testify in order to raise
and preserve a claim of improper impeachment through prior convictions. Morgan
v. State, 891 S.W.2d 733, 735 (Tex. App.--Houston [1st Dist.] 1994, pet. ref'd)
(citing Luce v. United States, 469 U.S. 38, 43, 105 S. Ct. 460, 464 (1984)); see also
Martinez v. State, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (holding that motions
in limine do not preserve error).

 Analysis

 As here, the appellant in Morgan filed a pre-trial "Motion to Testify Free From
Impeachment with Prior Convictions," which the trial court denied. Morgan, 891
S.W.2d at 734. The appellant in Morgan also did not testify, just as appellant did in
the present case. Id. In deciding Morgan, this Court examined the United States
Supreme Court opinion in Luce, and stated:

The court in Luce was most concerned with the fact that a reviewing
court cannot weigh the probative value [of the prior convictions] against
the prejudicial effect without a factual record of the defendant's
testimony. . . . The court in Luce was also concerned that the alleged
harm would be speculative, because the trial court would be free to
change her previous ruling and prohibit the impeachment. Alternatively,
the prosecutor might decide not to use an arguably inadmissible prior
conviction. Finally, even assuming that these difficulties could be
overcome, the reviewing court would be unable to conduct a harmless
error analysis if it determined that the prior convictions had been
improperly admitted, because the error would always be harmful if it
presumptively prevented the defendant from testifying in his own
defense.


Morgan, 891 S.W.2d at 735 (citing Luce, 469 U.S. at 43, 105 S. Ct. at 464) (internal
citations omitted). Identical concerns are present in this case, and appellant has not
presented us with a compelling reason to break with the previous holdings of this
Court.

 In his brief, appellant makes arguments based on Theus, 845 S.W.2d at 880-81
and Stokes v. State, 221 S.W.3d 101, 106-07 (Tex. App.--Houston [14th Dist.] 2006,
pet. granted). However, neither of these cases is applicable to appellant's case.

 In Theus, the appellant made pretrial motions to testify free from impeachment,
which the trial court overruled. Theus, 845 S.W.2d at 877. However, the appellant
in Theus went on to testify in his own defense and was actually impeached by the
State. Id. For the reasons we have already outlined, the balancing test outlined in
Theus cannot be applied when appellant has not actually been impeached by the State
and the trial court did not have the opportunity to weigh the probative value against
the prejudicial effect of admitting prior convictions. See Morgan, 891 S.W.2d at 735.

 In Stokes, the court of appeals "assumed without deciding" that the trial court
made a misstatement of the law that all of appellant's prior convictions--including
misdemeanors not involving moral turpitude--would be admissible if he testified. 
Stokes, 221 S.W.3d at 106. The Stokes court stated that "appellant's assertion that the
trial court made a misstatement that made his decision to testify involuntary" had to
be raised in the trial court in order to be preserved on appeal. Id. This is
distinguishable from the present case, which did not involve a misstatement of the
law. Here, appellant argued at trial and on appeal that the trial court improperly
conducted the Theus balancing test. As we have already established, the trial court
never had the opportunity to fully conduct the Theus test because appellant never
testified.

 We overrule appellant's third issue.

Conclusion

 We affirm the judgments of the trial court.






 Evelyn V. Keyes

 Justice


Panel consists of Chief Justice Radack and Justices Keyes and Higley.

Do not publish. Tex. R. App. P. 47.2(b).
1. These two charges were cause numbers 05CR3378 and 05CR3379 in the trial court,
and they are cause numbers 01-07-00265-CR and 01-07-00266-CR on appeal.
2. This charge was cause number 05CR2898 in the trial court, and it is cause number 01-07-00326-CR on appeal.
3. Appellant also alleges in his brief on appeal that Detective Johnston left the
complainant's description of her kidnapper's hair color out of the affidavit. We note,
however, that the affidavit did include that information.
4. The Texas Court of Criminal appeals has applied this reasoning in unpublished cases. 
See Ward v. State, No. AP-74695, 2007 WL 1492080, at *4 (Tex. Crim. App. May
23, 2007) (not designated for publication).