Opinion issued November 20, 2018



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00352-CR

————————————

**NELSON OROYO RODRIGUEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 351st District Court
Harris County, Texas
Trial Court Case No. 1515550

## MEMORANDUM OPINION

Appellant, Nelson Oroyo Rodriguez, was found guilty by a jury of capital murder and sentenced to life in prison. Appellant raises two issues on appeal. In his first issue, Appellant contends that the trial court abused its discretion when it did not suppress evidence obtained from the State's forensic analyses of his shoes and

his cell phone because he claims that the police illegally seized these items from the emergency room where he was receiving treatment for gunshot wounds. In his second issue, Appellant contends that the trial court abused its discretion when it did not suppress DNA and gunshot-residue evidence obtained without a search warrant.

Because we hold that the trial court did not abuse its discretion in allowing admission of the complained-of evidence, we affirm.

## Background

Osorio Gonzalez, D. Duarte, and three other people lived in a house on Dew Mist Lane in Houston. Gonzalez and Duarte sold illegal drugs from the house.

Appellant, and three other men—Eddy, Tecla, and Angel—agreed that they would enter the home to steal money and drugs. They drove to the home on a night when the house's occupants were not there. However, the robbers did not enter the house when they arrived. Angel later testified at trial that Tecla and Eddy wanted to wait until the occupants arrived home because they "wanted to get" one of the people that lived there.

When four of the house's occupants arrived home, the robbers forced their way into the house. Each of the robbers was armed with a handgun. One of the robbers held Duarte on the floor at gunpoint. Gonzalez retrieved a gun from a bedroom, and he and Appellant exchanged gunfire. Both were hit. Duarte was also shot. The robbers fled the house without taking anything.

2

Gonzalez and Duarte were taken to the hospital. Duarte survived his injuries, but Gonzalez died from the gunshot wounds inflicted by Appellant.

Appellant was dropped off at an urgent care center by the other robbers. He was then transported to the emergency room at the same hospital where Gonzalez and Duarte had been taken. Once there, he was interviewed by Harris County Sheriff's Deputy E. Fredrick. Before interviewing Appellant, Deputy Fredrick had been at the scene of the shootings on Dew Mist Lane.

Appellant told Deputy Fredrick that he had been robbed outside a club on Richmond Avenue in another part of Houston. He reported that, during the robbery, two men had jumped him and taken his cell phone and wallet. Appellant also claimed that the men had shot him in the chest and arm.

Deputy Fredrick doubted Appellant's story. Although Appellant claimed that his phone and his wallet had been taken during the robbery, the deputy noted that he had seen Appellant talking on his cell phone, and he had seen Appellant's wallet when he had asked Appellant for his identification. Deputy Frederick also knew that the home on Dew Mist Lane was near where Appellant had been taken for treatment.

Deputy Frederick called his supervisors and told them that Appellant was giving conflicting information about what had happened to him. The supervisors sent a crime scene unit, comprised of crime scene investigators Deputies B. Davis and D. Della Sala, to the hospital to gather forensic evidence. Deputy Davis later

3

testified that, when a patient is in the hospital with a gunshot wound, the crime scene unit photographs the person, collects the person's clothing, and takes physical samples to be tested for gunshot residue and for DNA analysis. Because Appellant's native language is Spanish, Deputy J. Reyes was also dispatched to act as a Spanish-English interpreter.

When the deputies arrived at the hospital, Appellant was in a bed in a room in the emergency department waiting to go to surgery for his gunshot wounds. Deputy Della Sala photographed Appellant and his room. He also collected Appellant's cell phone, wallet, and clothing, including his shoes, from the table beside Appellant's bed. The police did not access the cell's contents until later, after they obtained a search warrant for the phone's data.

Through Deputy Reyes, Deputy Davis asked Appellant if he could swab Appellant's hands to obtain samples for gunshot-residue testing and if he could take a buccal swab from Appellant's mouth for DNA testing. Appellant was informed that he could refuse the taking of the samples. Deputy Reyes reviewed Spanish-language consent forms with Appellant for the taking of the samples. After he had reviewed the consent forms, Appellant signed them, giving his permission for Deputy Davis to take the samples.

The samples taken from Appellant's hands were positive for gunshot residue. The analysis of Appellant's DNA profile was compared to the DNA profile of blood

4

stains found in the house on Dew Mist Lane. The results of the DNA comparison showed that Appellant could not be excluded as a contributor of some of the blood stains in the house. More precisely, the results indicated that the probability that the DNA found at the scene in some of the blood stains belonged to someone other than Appellant was approximately one in 2 sextillion, 562 quintillion for Caucasians; one in 7 sextillion, 299 quintillion for African Americans; and one in 732 quintillion, 900 quadrillion for Hispanics.

Appellant was not immediately arrested for murdering Gonzalez. Instead, the police waited several months until they had the results of the DNA analysis. Appellant was charged with capital murder for intentionally causing Gonzalez's death by shooting him while committing or attempting to commit the offense of burglary.

After they obtained the search warrant, the police accessed Appellant's cell phone data for analysis. The analysis showed that, around the time of the home invasion during which Gonzalez was shot, Appellant's cell phone had connected to cell phone towers near the home on Dew Mist Lane. The analysis showed that Appellant's cell phone had not connected to any cell phone towers near the club on Richmond Avenue where Appellant claimed that he had been robbed and shot at the time of the home invasion. The cell phone records also showed that Appellant had used his cell phone to communicate with three other people involved in the home

5

invasion. Analysis of Appellant's shoes, seized by Deputy Della Sala at the hospital, showed that shoe prints in the blood stains at the home were consistent with the tread pattern on Appellant's shoes.

Before trial, Appellant moved to suppress the DNA and gunshot-residue evidence, which were derived from the swabs of his mouth and hands, because the State did not have a warrant to collect the samples from him. Appellant did not dispute that he had signed the consent forms, permitting Deputy Davis to take samples for testing. Instead, he asserted that his consent was not voluntarily given due to the circumstances under which he gave consent at the hospital.

To demonstrate that Appellant had voluntarily consented to Deputy Davis taking samples, the State offered the testimony of three witnesses: C. Kendrick, the nurse who had treated Appellant in the emergency room, Deputy Davis, and the translator, Deputy Reyes. The State's witnesses all testified that Appellant was alert, orientated, and communicating well while he was in the emergency room.

Nurse Kendrick testified that Appellant had signed a consent form to permit surgery to be performed on him. Her testimony indicated that Appellant was able to understand the surgical consent form, and she had believed that Appellant was capable of signing the form and consenting to surgery.

The deputies testified that they had explained to Appellant that, because there had been a shooting, they needed to collect evidence, including buccal swabs for

DNA analysis and swabs for gunshot-residue analysis. They also explained the consent forms to Appellant, and they informed him that he was not required to provide the samples.

The deputies testified that Appellant was not under arrest when he was in the emergency room. They stated that they did not know whether Appellant was a shooting victim or a suspect when the samples were collected from him. Deputy Davis testified that, as a crime scene investigator, his job was to collect evidence to aid in the investigation. Whenever a shooting is involved, part of his job is to collect samples for gunshot-residue testing and DNA analysis.

Appellant offered his own testimony at the suppression hearing. He stated that he was in a great deal of pain while in the emergency room. He said that he did not remember speaking to the emergency room nurse or to the deputies. He also did not recall signing the consent form allowing the samples to be taken. At the end of the hearing, the trial court orally found that Appellant "with knowledge did freely and voluntarily give his consent for the DNA swab, as well as the consent for the gunshot residue search." Based on the finding, the trial court denied the motion to suppress the DNA and gunshot-residue evidence.

During trial, Appellant also objected to the admission of evidence derived from the seizure of Appellant's cell phone and his shoes, which were seized from the table beside his bed in the emergency room. Appellant asserted that the evidence

should be suppressed because the State did not have a warrant to seize the items, and he did not give his permission for the items to be seized. Outside the presence of the jury, Deputy Della Sala testified that he collected Appellant's clothing, shoes, cell phone, and wallet from Appellant's bedside table in the emergency room "for preservation of evidence purposes." The trial court denied the motion to suppress.

Appellant did not request that the trial court make written findings of fact and conclusions of law regarding his motions to suppress, and none were filed.

At trial, the State offered the testimony of the law enforcement officers involved in the investigation of Gonzalez's murder, including the testimony of Deputies Davis, Della Sala, Reyes, and Fredrick. Occupants of the home on Dew Mist Lane, who witnessed the home invasion, also testified.

The State called Appellant's accomplice, Angel, to testify. Angel testified that he, Appellant, and two other men entered the home on Dew Mist Lane to steal drugs and money. He said that they had purposefully waited to enter the house until the occupants arrived home. Angel testified that he witnessed Appellant shoot Gonzalez.

The State presented forensic evidence, including DNA evidence from which the jury could have reasonably inferred that Appellant's blood was found at the scene. The jury also heard that Appellant had tested positive for gunshot residue on his hands. Evidence that the tread pattern on Appellant's shoe matched a shoe print

8

in the blood on the floor of the home was also admitted into evidence. In addition, the State presented evidence relating to Appellant's cell phone, including evidence showing that Appellant's phone was near the Dew Mist Lane home at the time of the home invasion and not near the nightclub where he claimed to have been shot. The cell-phone evidence further showed that Appellant had been communicating with the other robbers on dates prior to the home invasion.

The jury found Appellant guilty of the offense of capital murder. Because the State did not seek the death penalty, the trial court sentenced Appellant to life in prison. This appeal followed.

## Motions to Suppress

In two issues, Appellant challenges the trial court's denial of his motions to suppress.

### A. Standard of Review

We review a trial court's denial of a motion to suppress under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We review the trial court's factual findings for abuse of discretion and review the trial court's application of the law to the facts de novo. *Id.* Almost total deference should be given to a trial court's determination of historical facts, especially those based on an evaluation of witness credibility or demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012). At a suppression

hearing, the trial court is the sole and exclusive trier of fact and judge of the witnesses' credibility and may choose to believe or disbelieve all or any part of the witnesses' testimony, even if that testimony is not controverted. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App. 2002).

When, as here, the trial court does not make findings of fact, we assume that the trial court made implicit findings that support its ruling, provided those implied findings are supported by the record. *State v. Gray*, 158 S.W.3d 465, 467 (Tex. Crim. App. 2005). We view the evidence in the light that most favors the trial court's ruling, and we uphold the ruling on any theory of law supported by the evidence. *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Brown v. State*, 212 S.W.3d 851, 867 (Tex. App.—Houston [1st Dist.] 2006, pet ref'd).

## B.    Applicable Legal Principles

Code of Criminal Procedure article 38.23(a) provides, "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." TEX. CODE CRIM. PROC. art. 38.23(a). Appellant contends that his Fourth Amendment rights were violated in this case when the police obtained evidence from him at the hospital without a warrant.

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. CONST. amend. IV. Reasonableness is the touchstone of the Fourth Amendment, and the reasonableness of a search or seizure "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

To suppress evidence based on an alleged Fourth Amendment violation, a defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador v. State*, 221 S.W.3d 666, 672 (Tex. Crim. App. 2007). A defendant satisfies this burden by establishing that a search or seizure occurred without the benefit of a warrant. *Id.* The prosecution then has the burden to establish that the search and seizure were nonetheless reasonable under the totality of the circumstances. *Id.* at 672–73.

Here, the record shows that the State did not have a warrant to seize Appellant's shoes and cell phone or to obtain DNA and gunshot-residue samples from him. Thus, the State had the burden of proving that the warrantless seizure of the items and the warrantless taking of DNA and gunshot-residue samples from Appellant were reasonable under the circumstances. *See id.*

11

## C.    Warrantless Seizure of Appellant's Shoes and Cell Phone

Appellant frames his first issue as follows: "The trial court abused its discretion by failing to suppress data obtained from the analysis of Appellant's shoes and cell phone because the items had been illegally seized without [a] warrant in violation of Article 38.23." Appellant asserts that the warrantless seizure of these items violated his Fourth Amendment rights and was not reasonable under the circumstances.

In his testimony, Deputy Della Sala indicated that he seized Appellant's clothing, wallet, shoes, and cell phone "for preservation of evidence purposes." The State asserted that seizure of the items was reasonable based on the exigent-circumstances exception to the warrant requirement. Exigent circumstances include the need to prevent the imminent destruction of evidence. *Kentucky v. King*, 563 U.S. 452, 460, 131 S. Ct. 1849, 1856 (2011). On appeal, Appellant claims that the State did not demonstrate in the trial court that the exigent-circumstances exception applied because it had not shown destruction of the cell phone or the shoes was imminent at the time they were seized.

In its brief, the State does not respond to the merits of Appellant's exigent-circumstances argument. Instead, it asserts a new theory to support the trial court's denial of the motion to suppress evidence. Because we must affirm if the trial court's ruling is correct on any theory of law applicable to the case, we address the plain-

12

view doctrine to determine if it supports the denial of the motion to suppress. *See Estrada*, 154 S.W.3d at 607; *see also Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (recognizing that appellate court will not disturb trial court's evidentiary ruling if ruling is correct on any theory of law applicable to ruling, even if trial court gave wrong reason for correct ruling); *Mahaffey v. State*, 316 S.W.3d 633, 637 (Tex. Crim. App. 2010) (holding that State could permissibly make new argument in support of trial court's ruling for first time on appeal because "an appellate court will uphold the trial court's ruling if that ruling is reasonably supported by the record and is correct on any theory of law applicable to the case").

Although searches conducted without a warrant are per se unreasonable, seizing evidence of a crime in plain view does not run afoul of the Fourth Amendment. *See Walter v. State*, 28 S.W.3d 538, 541 (Tex. Crim. App. 2000). "The 'plain view' doctrine permits an officer to seize contraband which he sees in plain sight or open view if he is lawfully where he is." *State v. Betts*, 397 S.W.3d 198, 206 (Tex. Crim. App. 2013).

A seizure of an object is lawful under the plain-view doctrine if three requirements are met. *Keehn v. State*, 279 S.W.3d 330, 334 (Tex. Crim. App. 2009). First, police officers must lawfully be where the object can be "plainly viewed." *State v. Betts*, 397 S.W.3d 198, 206 (Tex. Crim. App. 2013) (citing *Keehn*, 279 S.W.3d at 335). Second, the "incriminating character" of the object in plain view

must be "immediately apparent" to the police officers. *Id.* Third, the officials must have the right to access the object. *Id.*

The first requirement—that Deputy Della Sala was lawfully in the emergency department where the items were in plain view on Appellant's bedside table—does not appear to be in dispute. The police, including Deputy Della Sala, were at Appellant's bedside in the emergency department on official business to investigate the shooting of Appellant and two other people. Deputy Della Sala was present because, as a crime scene investigator, he had specialized training and expertise in the collection and preservation of evidence.

In his reply brief, Appellant asserts that the third requirement—that the police had the right to access his cell phone and shoes—was not satisfied. To support this position, Appellant relies on *United States v. Neely*, 345 F.3d 366 (5th Cir. 2003). *Neeley*, however, is inapposite. There, the Fifth Circuit held the plain-view doctrine did not allow the seizure of the patient's clothing because the clothing at issue was not in open view but in the hospital property storage room and required permission from hospital personnel to retrieve it. *Id.* at 368, 371. Similar facts are not present in this case.

Here, Deputy Della Sala testified that Appellant's clothes, shoes, cell phone, and wallet were on the table beside his bed in the emergency department. A photograph, taken by Deputy Della Sala and admitted into evidence, shows the bag

14

on the bedside table. The bag is wide open, on its side, with the contents partially spilling out. Some items also appear to be next to the bag on the table. Deputy Della Sala's testimony and the photograph demonstrate that, unlike in *Neeley*, the items here were in open view, and the police had access to the items while investigating the shooting of Appellant.

We note that the Supreme Court, in *Horton v. California*, indicated that the lawful access requirement is intended to clarify the principle that police may not enter a property to make a warrantless seizure based only on an officer's lawful observation of contraband in plain sight. 496 U.S. 128, 137 n.7, 110 S. Ct. 2301, 2308 n.7 (1990) (describing second requirement and explaining that even if "[i]ncontrovertible testimony of the senses" establishes that an object in plain view is contraband, "the police may not enter and make a warrantless seizure"); *see Betts*, 397 S.W.3d at 206–07 ("[T]he fact that officers could see [abused and starving] dogs from afar does not mean that they were entitled to go onto the property and seize the dogs without a warrant, at least in the absence of some other exigency."); *see also Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) (the "lawful right of access" requirement "is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances"; thus, while "lawfully positioned" "refers to where the officer stands

when she sees the item," "lawful right of access" refers "to where she must be to retrieve the item").

This case does not present a situation in which the police entered the hospital's emergency room *because* they saw contraband or evidence related to a crime that they wanted to seize. Instead, the police came to the hospital because three people with gunshot wounds, including Appellant, had been brought to the hospital. The police, including the deputies in the crime scene unit, were in the emergency department, where Appellant's personal items were in plain view, to perform their official duties of investigating the shooting of Appellant. Deputy Della Sala, as a crime scene investigator, was dispatched to the emergency department to use his specialized skills in collecting evidence as part of the investigation. Thus, Deputy Della Sala had lawful access to Appellant's shoes and cell phone in the ordinary course of the investigation at the time he seized the items. *See U. S. v. Davis*, 690 F.3d 226, 234, 238 (4th Cir. 2012) (holding that warrantless seizure of clothes from shooting victim's hospital room fell within plain view exception based in part on determination that police officer "was lawfully present in the hospital room, and he thus had lawful access in the ordinary course of his investigation to the bag of clothing which could be evidence against Davis's assailant"); *see also Washington v. Chrisman*, 455 U.S. 1, 9, 102 S. Ct. 812, 818 (1982) (stating that, "when a police officer, for unrelated but entirely legitimate reasons, obtains lawful access to an

16

individual's area of privacy . . .[,] the Fourth Amendment does not prohibit seizure of evidence of criminal conduct found in these circumstances").

The second requirement of the plain-view doctrine—that the "incriminating character" of the object in plain view must be "immediately apparent" to the police officers—requires a showing only of probable cause that the observed item is incriminating evidence; actual knowledge of the incriminating evidence is not required. *Joseph v. State*, 807 S.W.2d 303, 308 (Tex. Crim. App. 1991) (citing *Horton*, 496 U.S. at 136, 110 S. Ct. at 2308). Probable cause exists when the known facts and circumstances are sufficient to cause a reasonable person to believe that contraband or evidence of a crime will be found. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007). The question here is whether, given the known facts, a reasonable person would have believed that evidence of a crime would be found on Appellant's shoes and cell phone, items that were on Appellant's person at the time that he and two other people were shot.

In its brief, the State cites *Arrick v. State*, 107 S.W.3d 710, 719 (Tex. App.—Austin 2003, pet. ref'd) as supporting probable cause here. In that case, police believed that the appellant had killed a former girlfriend and disposed of her body. *Id.* Police obtained and executed a warrant to search the appellant's residence for, among other things, the victim's bloodstains. *Id.* at 716–17. The *Arrick* court determined that the magistrate who issued the warrant could have reasonably

17

inferred (1) that the appellant got blood on his clothing when he shot the deceased and disposed of her body, and (2) that bloodstained clothing might be found at the appellant's residence. *Id.* at 717. The following month, police conducted a second search of the appellant's residence with consent. *Id.* at 719. During this search, the officers seized two pairs of the appellant's shoes. *Id.* The court of appeals concluded that the plain-view doctrine applied to the seizure of the shoes for the following reason:

> We have already held in our discussion of the search warrants that the police had probable cause to believe that appellant fatally shot [his former girlfriend] and disposed of her body. They also had probable cause to believe that [her] blood might be found on appellant's clothing in [appellant's residence]. Because the police had probable cause to believe that [the deceased's] blood might be found on appellant's shoes, their value as evidence was immediately apparent.

*Id.* Thus, *Arrick* illustrates that police are justified in having probable cause to believe that forensic evidence of crime will be found on items worn by a person believed to have shot another person. *See id.*

Here, Deputy Della Sala testified that he was dispatched to Cypress Fairbanks Hospital in his role as a crime scene investigator. Deputy Della Sala was aware that Appellant was one of three people brought to the hospital with gunshot wounds inflicted in a "shooting incident." He stated that he knew that one of the other people had died from his injuries.

18

The evidence showed that, when the crime scene unit arrived, Appellant was in bed, wearing a hospital gown. His personal effects—his clothing, shoes, wallet, and cell phone—had been placed on his bedside table. From this, Deputy Della Sala could have reasonably inferred that Appellant had these items on his person at the time of the shootings, but they had been removed and placed on the bedside table so that he could receive medical treatment. Deputy Della Sala's testimony indicated that he collected Appellant's personal effects, including the cell phone and shoes, from the bedside table as evidence of either a crime committed by or against Appellant.

As stated, actual knowledge by Deputy Della Sala that the shoes and cell phone were incriminating evidence was not required. *See Joseph*, 807 S.W.2d at 308. Instead, it was enough that the known facts and circumstances were sufficient to cause Deputy Della Sala to believe that evidence of a crime would be found. *See Wiede*, 214 S.W.3d at 24. Given the nature and the extent of the forensic evidence typically associated with gunshot injuries, such as blood, Deputy Della Sala could have reasonably inferred that the items on Appellant's person at the time of the shootings, including his shoes and his cell phone, might contain useful forensic evidence of a crime. Sufficient evidence is contained in the record to satisfy the second requirement of the plain-view doctrine.

Viewing the evidence in the light that most favors the trial court's ruling, we conclude that the record supports an implied finding by the trial court that the police were justified in seizing Appellant's shoes and cell phone under the plain-view doctrine.[1] We hold that the trial court did not abuse its discretion in denying Appellant's motion to suppress evidence obtained from the seizure of the shoes and cell phone.

We overrule Appellant's first issue.

## D. Consent to Take DNA and Gunshot-Residue Samples

In his second issue, Appellant asserts that the trial court abused its discretion by failing to suppress the DNA and gunshot-residue test evidence because the evidence was obtained from samples taken from Appellant without a warrant. Appellant contends that the consent that he gave for the taking of the samples was not voluntary as orally found by the trial court at the conclusion of the suppression hearing.

A search conducted pursuant to voluntary consent is an established exception to the constitutional warrant requirement. *Reasor v. State*, 12 S.W.3d 813, 817 (Tex. Crim. App. 2000) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct.

---

[1] To be clear, the plain-view doctrine supports the seizure of the cell phone as a physical object. As mentioned in the background facts, the State did not access the data contents of Appellant's cell phone until after it had obtained a warrant allowing such access. *Cf. Riley v. Cal.*, 134 S. Ct. 2473, 2494 (2014) (holding that police must generally obtain a warrant before searching data contents of a cell phone).

2041 (1973)). Before a consent to search is deemed effective, the State must prove that the consent was freely and voluntarily given. *Meeks v. State*, 692 S.W.2d 504, 509 (Tex. Crim. App. 1985). In Texas, the State carries the burden to establish a valid consent to search by "clear and convincing" evidence. *Meekins v. State*, 340 S.W.3d 454, 459 (Tex. Crim. App. 2011). "The burden requires the prosecution to show the consent given was positive and unequivocal and there must not be duress or coercion, actual or implied." *Meeks*, 692 S.W.2d at 509. The ultimate question is whether the person's "will has been overborne and his capacity for self-determination critically impaired" such that his consent to search must have been involuntary. *Meekins*, 340 S.W.3d at 459.

The validity of a consent to search is a question of fact to be determined from all the circumstances." *Id.* at 458 (citing *Schneckloth*, 412 U.S. at 226–27, 93 S. Ct. at 2047). Resolving a question about the voluntariness of a consent requires the trial court to "conduct a careful sifting and balancing of the unique facts and circumstances of each case." *Id.* at 459. Because voluntariness is a fact intensive determination, the trial court's finding must be accepted on appeal unless it is clearly erroneous. *Id.* at 460.

The State presented three witnesses at the suppression hearing. The State first called, C. Kendrick, an emergency-room nurse who treated Appellant. She recalled that Appellant was "awake, alert, and oriented" while he was in the emergency room.

She indicated that she had no difficulty communicating with Appellant, who spoke English to her.

Nurse Kendrick testified that, before he underwent surgery, Appellant initialed and signed the consent form needed for the procedure. She recalled reviewing the surgical consent form with Appellant. She stated that her signature on the paperwork indicated that she had assessed Appellant and had believed that he was capable of consenting to surgery. Nurse Kendrick also explained that, when a patient is not able to give consent, the hospital has protocols in place to determine how care should proceed, but she indicated that those protocols were not needed in this case because Appellant was able to consent.

On cross-examination, Nurse Kendrick agreed that Appellant had been in pain while in the emergency room. She agreed that Appellant was given morphine while in the hospital. The defense asserted that the medical records indicated that the morphine had been given prior to Nurse Kendrick beginning her care of Appellant in the emergency room. Nurse Kendrick disagreed, stating that she read Appellant's medical records to show that he had been given morphine following his surgery. But Nurse Kendrick agreed that it was possible that Appellant had been given medication prior to surgery.

The next witness was Deputy Davis. He stated that he believed Appellant could not speak English, and Deputy Reyes was called in to act as a Spanish-

speaking translator. Deputy Davis testified that he explained to Appellant, through Deputy Reyes, that he was there to collect samples for gun-shot residue and DNA testing. Deputy Davis said that he never raised his voice to Appellant and spoke in a regular conversational tone. He stated that Appellant was cooperative.

Deputy Davis testified that Appellant was able to communicate, and it appeared from Appellant's demeanor that he understood what Deputy Reyes was telling him. Deputy Davis stated that Appellant never appeared to become incoherent. Appellant appeared to be in pain and at times would lie back and close his eyes, but he did not lose consciousness.

Deputy Davis also testified that he asked Deputy Reyes to inform Appellant that allowing the samples to be taken was "strictly voluntary." Deputy Davis explained to Deputy Reyes how the consent forms, needed for the taking of the samples, should be presented to Appellant. Deputy Reyes reviewed the consent forms, which were in Spanish, with Appellant. Appellant then signed two consent forms, one for the gunshot-residue sample and one for the DNA sample. The signed consent forms were admitted into evidence at the suppression hearing.

On cross-examination, the defense asked "if [Appellant] wanted to get up out of that bed and walk past you guys out the door, would he have been free to?" Deputy Davis answered, "No." He also indicated that there were deputies in the

hallway of the hospital that would not have permitted Appellant to leave the hospital at that time.

The State's last witness at the suppression hearing was Deputy Reyes, who acted as the Spanish-language translator. He stated that, at the time, he thought that Appellant was a victim not a suspect. Deputy Reyes said that Appellant was awake, able to communicate, and was cooperative. He said that he never raised his voice with Appellant but spoke in "regular" conversational tone with him.

Deputy Reyes testified that he explained to Appellant that they were there to investigate the home invasion. He made it clear to Appellant that it was Appellant's decision whether he participated in the taking of the samples. He said that Appellant appeared to understand and responded appropriately. Deputy Reyes indicated that Appellant was awake the entire time he was with him. He testified that Appellant was cooperative and at no time said that he did not want to speak to the police. Deputy Reyes said that Appellant voluntarily agreed to participate. He testified that Appellant read and signed the consent forms, permitting Deputy Davis to take the gunshot-residue and DNA samples. Deputy Reyes stated that he had reviewed the consent forms with Appellant before he signed them. He stated that Appellant was able to communicate with him about the forms and that Appellant answered questions that were on the gunshot-residue consent form.

On cross-examination, Deputy Reyes testified that he did not read Appellant's *Miranda* rights to him. *See Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966). The defense also asked Deputy Reyes if he had read any admonishments to Appellant like those given to DWI suspects before a breath or blood sample is taken for blood-alcohol content analysis. Deputy Reyes said that he had not.

When asked, Deputy Reyes said that Appellant was not under arrest in the emergency room. Toward the end of the suppression hearing, the trial court asked Deputy Reyes whether Appellant had been in custody at the time he consented to the samples, and the deputy said that Appellant was not in custody.

Appellant also testified at the hearing. He recalled that he was in a great deal of pain in the emergency room, but he did not remember speaking to Nurse Kendrick or to the deputies.

We now turn to determining whether the trial court's finding that Appellant's consent was voluntary was clearly erroneous. "To ensure that the correct legal issue is addressed, the Court of Criminal Appeals has instructed that we frame the issue as: 'Could a rational trier of fact conclude, by clear and convincing evidence (less than beyond a reasonable doubt), based upon all of the facts and logical inferences that can be drawn from those facts, and in the light most favorable to the prosecution, that [the appellant] voluntarily consented to the search?'" *Hutchins v. State*, 475

25

S.W.3d 496, 499 (Tex. App.—Houston [1st Dist.] 2015, pet. ref'd) (quoting

*Meekins,* 340 S.W.3d at 459 n.24)).

In his brief, Appellant summarizes, as follows, his argument in the trial court

regarding why his consent was not voluntary:

> Appellant was under the influence of morphine to stabilize him, and/or in extreme pain, at the time the officers stated they obtained consent. Further, Appellant was not admonished of his rights, was not free to leave due to law enforcement obstruction and his injuries, and likely had a bullet inside of him at the time the officers purported to obtain his signature and consent. Moreover, a search warrant could easily have been obtained in this case, and any resulting delay would not have resulted in a loss of evidence. Additionally, Appellant was not *Mirandized* or otherwise admonished of his rights in a similar manner to a DWI investigation. Therefore, under the totality of the circumstances, Appellant's consent was involuntary and coerced.

He reiterates these arguments on appeal. Appellant contends the trial court's

oral voluntariness finding was "clearly erroneous because the evidence showed that

Appellant was not properly informed of his rights, was not aware of his right to

decline, and the questioning was psychologically harmful as he was being treated

for a gunshot wound at the time, thereby rendering his consent involuntary."

Factors to be considered in evaluating whether Appellant's consent was

voluntary include: whether the accused was advised of his constitutional rights, the

length of the detention, whether the questioning was repetitive or prolonged, whether

the accused was aware that he could decline to give the samples, and what kind of

psychological impact the questioning had on the accused. *See Schneckloth*, 412 U.S. at 226–27, 93 S. Ct. at 2047.

With respect to the factors to consider, Appellant "concedes that the factor regarding the repetitive or prolonged nature of the questioning weighs in the State's favor. There was no showing that the officers repeatedly asked Appellant for his consent, told him they would get a warrant, or otherwise demonstrated that Appellant's consent was required or demanded." Appellant contends that Deputy Davis testified that Appellant had been "detained," but Appellant acknowledges "that the length of detention was not overly long[.]" Appellant "concedes that two of the five factors utilized to evaluate the voluntariness of consent clearly weigh in favor of admission [of the gunshot-residue and DNA evidence]."

However, Appellant claims that "the remaining three factors"—whether he was advised of his constitutional rights, whether he was aware that he could decline to participate, and what kind of psychological impact the questioning had on him— weigh in favor of a finding that his consent was not voluntary and outweigh the factors supporting the trial court's finding that his consent was voluntary. To support his argument, Appellant first points out that he was not advised of his constitutional rights. He cites evidence indicating that he was not given *Miranda* warnings. He also points out that he was not admonished in manner similar to a DWI suspect asked to provide a breath or blood specimen. In making this argument, Appellant makes

no showing that he was entitled to either type of warning before being asked to consent to the taking of the DNA and gunshot-residue samples.

The Court of Criminal Appeals has made clear that there is "no authority that requires informing a suspect of his rights under *Miranda* before obtaining a consent to search." *Rayford v. State*, 125 S.W.3d 521, 528 (Tex. Crim. App. 2003). "While the failure to inform a suspect that evidence found can be used against him may be one factor to consider, it would not automatically render his consent involuntary. *Id.*

Regarding the whether-he-was-aware-that-he-could-decline-to-participate factor, Appellant asserts that, while "most citizens are aware of their constitutional right to remain silent,". . . even reasonable persons might not be aware that they possess protected privacy concerns" in physical samples provided for forensic testing. He claims this is particularly true for him because he primarily speaks Spanish with a limited understanding of English.

In addressing this factor, however, Appellant does not acknowledge that Deputy Davis testified that he told Deputy Reyes to tell Appellant in Spanish that providing the samples was "strictly voluntary." Deputy Reyes testified that he did a word-for-word translation of what Deputy Davis said. Deputy Reyes also testified that he informed Appellant in Spanish that it was Appellant's decision whether he wanted to give the samples. Deputy Reyes indicated that Appellant appeared to understand what he was telling him and responded appropriately. As the fact finder,

the trial court could have chosen to believe the deputies' testimony. We disagree with Appellant that this factor weighs against the trial court's determination that Appellant's consent was voluntary. Instead, this factor supports the trial court's finding.

Lastly, Appellant asserts that "the psychological impact of being questioned immediately prior to having a bullet surgically removed from one's person weighs in his favor and overrides many, if not all, other concerns." Appellant points out that Nurse Kendrick agreed that Appellant was in a "critical state" when he was brought into the emergency room. She also agreed that Appellant was in pain. However, Nurse Kendrick testified that Appellant was alert, orientated, and communicating well. She stated that she reviewed the surgical consent form with Appellant before he signed it. She believed that he understood the form and that he was able to consent to surgery. Nurse Kendrick indicated that she would not have allowed Appellant to sign the surgical consent form if she had believed that he did not have the ability to consent to surgery.

Appellant also points out that Deputy Davis testified that Appellant appeared to be in pain. Deputy Davis stated that Appellant opened and closed his eyes at times during the time he was with Appellant. Deputy Davis said that Appellant would "go into that, Ugh, kind of movement and then open his eyes again." However, Deputy Davis and Deputy Reyes both testified that Appellant never lost consciousness while

they were there. They testified that Appellant appeared coherent. Deputy Reyes stated that Appellant appeared to understand what he was being told and was able to communicate effectively.

Appellant further asserts that the record suggests that he may have been "intoxicated" because he had been given morphine. However, the record is not clear whether he had taken morphine before he gave his consent for Deputy Davis to take the samples. Nurse Kendrick testified that she read Appellant's medical records to indicate that he was given morphine after surgery while he was in the ICU, not while he was in the emergency room.

As the fact finder, it was for the trial court to weigh the evidence and to resolve any conflicts presented by it. From the witnesses' testimony, the trial court could have reasonably inferred that Appellant had the ability to consent to the taking of the DNA and gunshot residue samples. The evidence was sufficient for the trial court to have decided that the "psychological impact" factor did not weigh against a determination that Appellant voluntarily consented to the taking of the samples.

In accordance with the established standard of review on a motion to suppress, we afford "almost total deference" to the trial court's factual finding that Appellant voluntarily consented to the taking of the DNA and gunshot-residue samples. *See Hutchins*, 475 S.W.3d at 501. The trial court's finding was supported in the record by the Nurse Kendrick's and the deputies' testimony regarding Appellant's mental

state at the time he signed the consent forms that allowed the samples to be taken. Because the court's finding is not "clearly erroneous" when viewed in the light most favorable to the prosecution, we accept it on appeal. *See id.* (citing *Meekins*, 340 S.W.3d at 459 n.24, 460). We hold that the trial court did not abuse its discretion by denying Appellant's motion to suppress evidence obtained from the DNA and gunshot-residue samples.

We overrule Appellant's second issue.

## Conclusion

We affirm the judgment of the trial court.

Laura Carter Higley
Justice

Panel consists of Justices Jennings, Higley, and Massengale.

Do not publish. Tex. R. App. P. 47.2(b).